**Slip Op. 10-41**

**UNITED STATES COURT OF INTERNATIONAL TRADE**

---

ZHEJIANG DUNAN HETIAN METAL CO., LTD.

               Plaintiff,

               v.

UNITED STATES,

               Defendant,

               - and -

PARKER-HANNIFIN CORP.,

               Defendant-Intervenor.

Before: Pogue, Judge
Court No. 09-00217

**PUBLIC VERSION**

---

**OPINION AND ORDER**

[Plaintiff's motion for judgment upon the administrative record denied.]

Dated: April 19, 2010

Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP (Mark E. Pardo and Andrew T. Schutz) for the Plaintiff.

Tony West, Assistant Attorney General; Jeanne E. Davidson, Director; Patricia M. McCarthy, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (L. Mischa Preheim and Carrie A. Dunsmore); and, of counsel, Joanna Theiss, Office of the Chief Counsel for Import Administration, United States Department of Commerce, for the Defendant.

Roetzel & Andress, LPA (Donald R. Dinan and Craig A. Koenigs) for the Defendant-Intervenor.

**Pogue, Judge:** This case involves a challenge to the United States Department of Commerce's ("Commerce" or "the Department")

data choices and adjustments in its calculation of an antidumping

("AD") duty on goods produced in a non-market economy ("NME").

Specifically, Plaintiff Zhejiang DunAn Hetian Metal Co., Ltd.

("DunAn") challenges the Department's data selection, use of

partial adverse facts available ("AFA"), and scrap offset

methodology in Commerce's final affirmative determination AD duty

order regarding frontseating service valves ("FSVs") from the

People's Republic of China ("China").[1]

The court has jurisdiction pursuant to 28 U.S.C. § 1581(c).

Currently before the court is DunAn's USCIT R. 56.2 Motion for

Judgment Upon the Agency Record.

### Standard of Review

The statutory provision which supplies the standard for review

for Commerce's final determination requires that the court shall

"hold unlawful any [agency] determination, finding, or conclusion

found . . . to be unsupported by substantial evidence on the

record, or otherwise not in accordance with law." Tariff Act of

---

[1] See Frontseating Service Valves From the People's Republic
of China, 74 Fed. Reg. 10,886 (Dep't Commerce Mar. 13, 2009)
(final determination of sales at less than fair value and final
negative determination of critical circumstances) ("Final
Determination"), and accompanying Issues and Decision Memorandum,
A-570-933, [period of investigation ("POI")] 7/1/07 - 12/31/07
(Mar. 6, 2009), Admin. R. Pub. Doc. 226, available at
http://ia.ita.doc.gov/frn/summary/PRC/E9-5480-1.pdf (last visited
Apr. 19, 2010) ("Decision Mem."); Frontseating Service Valves
from the People's Republic of China, 74 Fed. Reg. 19,196 (Dep't
Commerce Apr. 28, 2009) (AD duty order).  Commerce selected
DunAn, a Chinese producer of FSVs, as a mandatory respondent in
this administrative proceeding.

1930, § 516A(b)(1)(B)(i), 19 U.S.C. § 1516a(b)(1)(B)(i)(2006).[2] <u>See also</u> 19 U.S.C. §§ 1516a(a)(2)(A)(i)(II), 1516a(a)(2)(B)(i); <u>Huaiyin Foreign Trade Corp. (30) v. United States</u>, 322 F.3d 1369, 1374 (Fed. Cir. 2003).

## Discussion

By its instant motion, DunAn seeks (1) recalculation of the Indian[3] import statistics used to value brass bar[4]; (2) replacement of the labor wage rate -- calculated in accordance with the Department's regulatory regression analysis[5] -- with an Indian labor rate of $0.21 per hour; (3) reversal of the Department's application of partial AFA to DunAn's December 2007 U.S. sales data and inventory carrying costs ("ICC")[6]; and (4) revision of the

---

[2] Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S. Code, 2006 edition.

[3] Plaintiff does not challenge the choice of India as the appropriate country from which to select the relevant data. <u>See</u> 19 U.S.C. § 1677b(c)(4) (providing for the valuation of merchandise exported from a nonmarket economy, to "the extent possible," using prices or costs in a comparable market economy country).

[4] DunAn uses brass bar to make FSV valve bodies and valve stems. <u>See</u> <u>Frontseating Service Valves from the People's Republic of China</u>, 73 Fed. Reg. 20,250, 20,253 (Dep't Commerce Apr. 15, 2008)(initiation of AD duty investigation).

[5] <u>See</u> 19 C.F.R. § 351.408(c)(3)(2009) (providing for the use of "regression-based wage rates reflective of the observed relationship between wages and national income in market economy countries.").

[6] ICC are costs associated with keeping merchandise in inventory before it is sold. <u>Mittal Steel Point Lisas Ltd. v.</u>

Department's methodology for recognizing the value of DunAn's recycled brass scrap.

The court will, in turn, analyze each of these values.

**A. Commerce's Selection of a Value for Brass Bar**

Commerce's selection of a value for brass bar is governed by 19 U.S.C. § 1677b(c), which requires that Commerce choose data that is the "best available information" on the record.[7]  Here, Commerce

_____

United States, 31 CIT 638, 645, 491 F. Supp. 2d 1222, 1230 (2007), aff'd, 548 F.3d 1375 (Fed. Cir. 2008).  Commerce's authority to account for ICC arises from 19 U.S.C. § 1677a(d). NTN Bearing Corp. of Am. v. United States, 368 F.3d 1369, 1373 (Fed. Cir. 2004).

[7] Section 1677b(c)(1) provides that Commerce

    shall determine the normal value of the subject
    merchandise on the basis of the value of the factors of
    production ["FOP"] utilized in producing the
    merchandise . . . . the valuation of the [FOPs] shall
    be based on the best available information regarding
    the values of such factors in a market economy country
    or countries considered to be appropriate by
    [Commerce].

19 U.S.C. § 1677b(c)(1)(emphasis added).

    As the court has previously noted:

        The term "best available" is one of comparison,
    i.e., the statute requires Commerce to select, from the
    information before it, the best data for calculating an
    accurate dumping margin. The term "best" means
    "excelling all others." This "best" choice is
    ascertained by examining and comparing the advantages
    and disadvantages of using certain data as opposed to
    other data.

Dorbest Ltd. v. United States ("Dorbest I"), 30 CIT 1671, 1675, 462 F. Supp. 2d 1262, 1268 (citations omitted).

selected an average unit value ("AUV") derived from the World Trade Atlas ("WTA")[8] Indian import statistics for the POI. DunAn does not challenge Commerce's use of the WTA data set in general or the particular HTS classification used.[9] Rather, DunAn argues that some aspects of the WTA data set are incorrect and should be eliminated. Specifically, DunAn challenges the sufficiency of the evidence to support Commerce's inclusion, in the WTA data, of brass bar values for Indian imports from France, Japan, and the United Arab Emirates ("UAE").[10]

The relevant WTA data for HTS 7407.21.10 "Bars of Brass" are as follows:

---

[8] Global Trade Information Services, Inc. publishes the WTA, organizing the data using the Indian Harmonized Tariff Schedule ("HTS") classifications. See Global Trade Information Services, Inc., World Trade Atlas®, http://www.gtis.com/english/GTIS_WTA.html (last visited Apr. 19, 2010). Global Trade Information Services, Inc. obtains the specific import values for India contained in the WTA directly from the Directorate General of Commercial Intelligence and Statistics, Ministry of Commerce of India; the WTA reports the data in rupees. See Frontseating Service Valves from the People's Republic of China, 73 Fed. Reg. 62,952, 62,957 (Dep't Commerce Oct. 22, 2008) (preliminary determination of sales at less than fair value, preliminary negative determination of critical circumstances, and postponement of final determination).

[9] Thus the representativeness of the WTA under HTS 7407.21.10 as to the brass bar that DunAn actually uses as an FOP is not at issue before the court. (Cf. Pl.'s Rule 56.2 Mot. for J. Upon Agency R. ("Pl.'s Br.") 5, 14-15.)

[10] Denying DunAn's request, Commerce did not, in the underlying investigation, remove UAE, French, or Japanese imports from the AUV calculated from WTA data.

| Country | Quantity (Kgs) | Value (Rupees) | AUV |
|---|---|---|---|
| Sri Lanka | 44,720 | 7,990,000 | 178.67 |
| Malaysia | 24,262 | 8,031,000 | 331.01 |
| UAE | 8,000 | 3,652,000 | 456.50 |
| Germany | 4,526 | 2,581,000 | 570.26 |
| Japan | 3,911 | 1,574,000 | 402.45 |
| United Kingdom | 3,380 | 1,779,000 | 526.33 |
| Denmark | 1,300 | 541,000 | 416.15 |
| Netherlands | 1,042 | 501,000 | 480.81 |
| Singapore | 392 | 487,000 | 1,242.35 |
| France | 261 | 374,000 | 1,432.95 |
| United States | 90 | 78,000 | 866.67 |
| **TOTAL** | **91,884** | **27,588,000** | **300.25** |

Petitioner's Surrogate Value Comments Regarding Frontseating Service Valves from the People's Republic of China, A-570-933, POI 7/01/07 - 12/31/07 (Sept. 29, 2008), Admin. R. Pub. Doc. 106,[11] at Ex. 1A. See also Zhejiang DunAn Heitan's First Surrogate Value Submission, A-570-933, POI 7/01/07 - 12/31/07 (Sept. 29, 2008), Admin. Pub. Doc. 107 ("DunAn's First Surrogate Value Submission"), at Ex. 3A. See also Antidumping Duty Investigation of Frontseating Service Valves from the People's Republic of China: Factor Valuations for the Final Determination, A-570-933, POI 7/1/07 - 12/31/07 (Mar. 6, 2009), Admin. R. Pub. Doc. 227, at Attach. 3 (providing HTS classification for "Of copper-zinc base alloys

---

[11] In the record the Department provided to the court, Commerce has organized the documents according to sequence numbers. Administrative record document numbers and sequence numbers may be cross-referenced using court document number 22.

(brass) . . . Bars" as HTS 7407.21.10).

Failing to remove imports from France, Japan, and the UAE constituted error, according to DunAn, because other record evidence, *i.e.*, data from Infodrive India,[12] demonstrated that shipments from the above countries did not consist of brass[13] bar, and, thus, that WTA data as to the UAE, France, and Japan were flawed and unreliable.

--------

[12] Infodrive India Pvt Ltd., an Indian company, publishes export and import information from India and other countries. Infodrive India, http://www.infodriveindia.com/ (last visited Apr. 19, 2010). Each month, Infodrive India "collects, collates and standardizes," from Indian ports, over two million export shipping bills and import bills of entry. Infodrive India, Benefits of India Export Import Data, http://www.infodriveindia.com/India-Trade-Data/Benefits.aspx (last visited Apr. 19, 2010). Infodrive India then cleans up and stores the data on its server. Id. Due to inconsistencies in product information and the fact that, according to Infodrive India, "classification is often wrong," Infodrive India provides, for each import or export, the actual product description as well as the reported HTS Code. Id. As recognized in Dorbest I, "Infodrive India presents Indian government import data that it receives on a monthly basis from the Indian customs department." Dorbest I, 30 CIT at 1697, 462 F. Supp. 2d at 1285. "Infodrive India data appears to be the same data provided [in the WTA] in a desegregated form, providing descriptions of the items that are imported and classified under a particular [HTS] subheading." 30 CIT at 1697, 462 F. Supp. 2d at 1285-86. In essence, Infodrive India is a subset of the WTA, only more detailed. 30 CIT at 1697, 462 F. Supp. 2d at 1286.

[13] Brass is "[a]n alloy of copper and zinc." Webster's II New Riverside University Dictionary 197 (1988). Copper is "[a] ductile, malleable, reddish-brown metallic element that is an excellent conductor of heat and electricity and is used for electrical wiring, water piping, and corrosion-resistant parts," id. 310, whereas zinc is "[a] bluish-white, lustrous metallic element used to form a wide variety of alloys including brass [and] bronze . . . ." Id. 1339.

The Infodrive India data as to France, Japan, and the UAE[14] are as follows:

| HTS Code | Actual Product Description | Origin | Qty (Kgs) | Value (Rupees) | AUV |
|---|---|---|---|---|---|
| 74072110 | Barre B33/25 H Q1.5MM (Copper Bar) | France | 12.0 | 57091.02 | 4757.59 |
| 74072110 | Bronze Bars (Aircraft Raw Materials for Defence Use)P.O.NO: 4160375 | France | 161.0 | 316566.20 | 1966.25 |
| 74072110 | Beryllium Copper Flat Bar (TK46267) | Japan | 3589.5 | 1444719.91 | 402.49 |
| 74072110 | Beryllium Copper Round Bar (TK46268) | Japan | 322.0 | 129600.17 | 402.49 |
| 74072110 | Cupro Nickel Bar | UAE | 8110.0 | 3652206.74 | 450500.40 |

Second Surrogate Value Submission of Zhejiang DunAn Heitan ("DunAn"): Investigation of Frontseating Service Valves from the People's Republic of China, A-570-933, POI 7/1/07 – 12/31/07 (Dec. 15, 2008), Admin. R. Pub. Doc. 189 ("DunAn's Second Surrogate Value Submission"), at Ex. 2. DunAn stresses that copper bar, bronze[15]

---

[14] Infodrive India reported UAE data in metric tons, which the court translated into kilograms.

[15] Bronze is "[a]n alloy of copper and tin, occas[ionally] with traces of other metals" or "[a]n alloy of copper, with or without tin, and antimony, phosphorus, or other components." Webster's II New Riverside University Dictionary, supra note 13, at 203.

bar, beryllium[16] copper bar, and cupronickel[17] bar are distinct from

brass bar.[18]

As a result, the dispute between the parties on this issue

turns on Commerce's assessment of these Infodrive data.  Explaining

its decision not to exclude these imports, Commerce stated:

> we find that the Infodrive data contain insufficient
> product information in the description of the line items
> to enable the Department to make a definitive
> determination that these line items are misclassified.
> Specifically, the product description in the Infodrive
> data are such that, given the dependency upon the
> chemical make-up of the underlying products, they could
> be properly classified within the Indian HTS category
> where they are, or in the category addressed by DunAn.
> Thus, the Department cannot determine, due to lack of
> product detail, i.e., chemical properties, the precise
> chemical make-up of these line items. Accordingly,
> without clear evidence to the contrary, the Department
> will not speculate that these materials have been
> misclassified. Therefore, . . . the Department has
> determined to include imports from Japan, France, and the
> UAE in calculating the surrogate value for brass bar in
> the final determination because the record evidence does
> not demonstrate that the imports from these countries
> were misclassified.

---

[16] Beryllium is "[a] high-melting, lightweight, corrosion-resistant, rigid, steel-gray metallic element used as an aerospace structural material, as a moderator and reflector in nuclear reactors, and in a copper alloy used for springs, electrical contacts, and nonsparking tools." Webster's II New Riverside University Dictionary, *supra* note 13, at 167.

[17] Cupronickel is "[a] copper-based alloy containing 10-30% nickel." Webster's II New Riverside University Dictionary, *supra* note 13, at 336. Nickel is "[a] silvery, hard, ductile, metallic element used in alloys, in corrosion-resistant surfaces and batteries, and for electroplating . . . ." Id. 794.

[18] Should Commerce exclude import information from the UAE, France, and Japan, the AUV for brass bar would decrease by 8.13%.

Decision Mem. at 21.[19]

DunAn argues that Commerce should have accorded more weight to the Infodrive India data and that Commerce should have, based on these data, eliminated the three countries' data as unreliable. DunAn in addition contends that it is irrelevant which HTS classification applies; "[t]he issue is not whether these shipments have been properly classified within the HTS [but rather] is whether these shipments are representative of the factor input Commerce is attempting to value." (Pl.'s Br. 13.)  DunAn offered record evidence to demonstrate that bronze, beryllium copper, and cupronickel have different chemical properties and have different

---

[19] Moreover, in its analysis during its preliminary investigation, Commerce concluded that WTA data:

> represent an average of import prices, net of taxes and import duties, and contemporaneous with the POI for the input in question. . . . Our analysis of the WTA data shows that the Infodrive data, analyzed by quantity, only accounts for 26 percent of the WTA data. We derived this figure by dividing the total quantity of the misclassified line items by the total quantity of WTA data. . . .

> Furthermore, record evidence indicates that the line items that DunAn argues represents materials that are misclassified [] are, in fact, types of brass, and therefore these line items are not outside the HTS category.

Antidumping Duty Investigation of Frontseating Service Valves from the People's Republic of China: Factor Valuations for the Preliminary Determination, A-570-933, POI 7/1/07 - 12/31/07 (Oct. 15, 2008),  Admin. R. Pub. Doc. 150 ("Factor Valuations Prelim. Mem."), at 7.  Because the court affirms Commerce's decision in the Final Determination, the court need not address these additional reasons given for Commerce's determination.

uses than brass. (See id. 12-13;) DunAn's Second Surrogate Value Submission at Exs. 3A-3E. Therefore, according to DunAn, because the data from these three countries distorted the resulting brass bar surrogate value and because the Department's usage of that WTA data is not a selection of the "best available" evidence, Commerce's determination is unsupported by substantial evidence.[20]

The government responds that the complete WTA data set under HTS category 7407.21.10 was the best available information on the record. Commerce chooses surrogate values on a case-by-case basis, and prefers to use "public, country-wide data." (Def.'s Opp'n to Pl.'s Mot. for J. Upon the Agency R. ("Def.'s Br.") 27 (quoting Mittal Steel Galati S.A. v. United States, 31 CIT 1121, 1124, 502 F. Supp. 2d 1295, 1298 (2007)).) Consequently, the government argues, Commerce used "the full WTA data set, with the exception of imports from non-market economy countries, countries known to have country-wide export subsidies, or unidentified countries . . . because [the data] are publicly-available, broad-based, product-specific, tax-exclusive and contemporaneous." (Id. (citing Decision Mem. at 22-23).) In addition, the government points out that Commerce did in fact examine the Infodrive India data, but did not find them definitive, particularly because DunAn failed to "provide

_____

[20] DunAn's argument is that Commerce should have used data from Infodrive India to discredit certain WTA data. This is a factual question. See Dorbest I, 30 CIT at 1676, 462 F. Supp. 2d at 1268.

any specific evidence that entries containing a certain amount of a chemical were inappropriately considered 'brass bar' such as would be classified under the HTS category for brass bar." (Id. 27, 28.)

The government is correct. The problem with DunAn's claim is that it does not focus on the specific information in the administrative record. In scrutinizing the Infodrive India data, Commerce confronted two inconsistent descriptions of the imports from the three countries at issue. Whereas the Infodrive India spreadsheet listed an "actual product description" for France, Japan, and the UAE, specified as copper and bronze, beryllium copper, and cupronickel, respectively, the spreadsheet also categorized the imported metals as "brass" under the HTS Code. Bronze, brass, beryllium copper, and cupronickel are all copper alloys and, although having distinct properties and uses, the types of metals at issue here are relatively similar in chemical makeup. See supra notes 13, 15-17. The accuracy of labels assigned to these imports, therefore, depends very much upon the types and percentages of metals contained therein. Commerce did not have this information. Thus, even had Commerce solely relied upon the Infodrive data, Commerce would still have had to choose between the "brass bar" classification listed and the perhaps conflicting product description. It was therefore reasonable for Commerce to rely upon the Infodrive India HTS classifications rather than the

product descriptions, the former being consistent with the WTA data. As the court frequently emphasizes, "the possibility of drawing two inconsistent conclusions from the evidence does not prevent [Commerce's] finding from being supported by substantial evidence." Matsushita Elec. Indus. Co. v. United States, 750 F.2d 927, 933 (Fed. Cir. 1984) (quoting Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 619-20 (1966)). It is not the court's place to choose between the classification and the description based on this record. See U.S. Steel Group v. United States, 96 F.3d 1352, 1357 (Fed. Cir. 1996).

DunAn cites to opinions of the Court which, according to DunAn, "admonished the Department . . . for failing to accord sufficient weight to Infodrive India data or other trade intelligence data that indicated the Indian import statistics utilized for the surrogate value were not representative of the input being valued." (Pl.'s Br. 9-12 (discussing Taian Ziyang Food Co. v. United States, __ CIT __, __, 637 F. Supp. 2d 1093, 1149 (2009); Zhengzhou Harmoni Spice Co. v. United States, __ CIT __, __, 617 F. Supp. 2d 1281, 1325, 1327 (2009); Globe Metallurgical, Inc. v. United States, No. 07-00386, 2008 WL 4417187, at *5-7 (CIT Oct. 1, 2008); Longkou Haimeng Mach. Co. v. United States, __ CIT __, __, 581 F. Supp. 2d 1344, 1363 (2008)).) See also Dorbest I, 30 CIT at 1698, 1700, 462 F. Supp. 2d at 1286, 1288.

The case law DunAn cites, however, focuses on Commerce's

failure to provide a sufficient reasoned explanation of its chosen data set.[21]  In these cases, the Department wholly failed to address "whether or not Infodrive India casts light on potential inaccuracies" in the WTA data. Dorbest I, 30 CIT at 1695, 462 F. Supp. 2d at 1284. See also Zhengzhou, __ CIT at __, 617 F. Supp. 2d at 1322-23 (rejecting Commerce's cursory presumption that Infodrive data were unreliable without "even a scintilla of evidence of manipulation or distortion or affiliation"), 1326-27; Taian Ziyang, __ CIT at __, 637 F. Supp. 2d at 1156 ("Commerce simply dismissed [respondents'] concerns" in a "terse three sentences" and "failed

---

[21] See Taian Ziyang, __ CIT at __, 637 F. Supp. 2d at 1126 (determining that Commerce had not supported its choice of data set with substantial evidence, as it had "failed to establish that its chosen data[]set . . . adequately approximates the respondent's production experience" and "failed to establish that the NDRDF data are sufficiently representative of the garlic seed used by respondents"), 1144, 1156, 1157, 1162; Zhejiang Native Produce & Animal By-Products Imp. & Exp. Group v. United States ("Zhejiang I"), No. 06-00234, 2008 Ct. Intl. Trade LEXIS 69, at *53 (CIT June 16, 2008) (repudiating Commerce's conclusion that its chosen data are most reliable, to value brokerage and handling, due to the data's "quality and specificity," when Commerce "at no point . . . explain[ed] how the data meets either one of these standards"); Zhengzhou, __ CIT at __, 617 F. Supp. 2d at 1297-1303 (holding Commerce's grounds for using Agmarket data "impermissibly speculative"), 1308-12 (noting Commerce's failure to support its use of Maersk data with record evidence), 1321 ("Commerce failed to explain how the seemingly non-representative import data is the best available information when domestic data on the record represent the exact type of product used by the respondents and actual domestic market prices for that input." (citation, quotation marks, emphasis, & alterations omitted)); Globe Metallurgical, 2008 WL 4417187, at *7; Longkou, __ CIT at __, 581 F. Supp. 2d at 1363; Allied Pac. Food (Dalian) Co. v. United States ("Allied Pac. I"), 30 CIT 736, 752-68, 435 F. Supp. 2d 1295, 1309-22 (2006).

to directly confront" respondent's claims), 1159-60.  Instead, Commerce "conclude[d] that Infodrive data [are] unreliable or contain[] misclassifications, while simultaneously claiming that [WTA data are] both reliable and contain[] no inaccuracies." Dorbest I, 30 CIT at 1697, 462 F. Supp. 2d at 1286.

In the determination at issue in this case, however, the Department directly addressed the relevance of the Infodrive data to the WTA data.  Commerce did not merely dismiss the Infodrive India data out of hand, nor did it make a general finding that Infodrive data were unreliable.[22]  Rather, Commerce, assuming the Infodrive data were in fact reliable, directly discussed Infodrive India's relevance to the WTA data and found the Infodrive data to be inconclusive.

Further, even if the overall WTA data were being challenged, DunAn did not present Commerce with evidence that HTS 7407.21.10 includes imports that are other than the specific input at issue here.  Moreover, DunAn did not provide evidence, other than Infodrive India, to attempt to demonstrate WTA misclassifications. Compare Dorbest I, 30 CIT at 1694, 462 F. Supp. 2d at 1283 (noting that respondents provided evidence that Taiwanese export data did

---

[22] In this respect, the issue here differs from that in Zhengzhou, where the court rejected the Department's "bare speculation" and unsupported presumptions about the domestic data's reliability. __ CIT at __, 617 F. Supp. 2d at 1317, 1320-21, 1322-23, 1325.

not match the WTA-listed Indian imports from Taiwan).[23] See also

Allied Pac. I, 30 CIT at 754-55, 435 F. Supp. 2d at 1311-12;

Zhengzhou, __ CIT at __, 617 F. Supp. 2d at 1317 (rejecting

Commerce's determination on grounds that plaintiffs provided

specific proof that the relevant HTS classification was too broad

and "the great majority of entries" covered goods other than the

subject merchandise (quotation marks & citation omitted)).  In

other words, here, both the WTA data and the Infodrive India data

are sufficiently product-specific or representative to be

considered the "best available" information.  As the finder of

fact, Commerce therefore had the discretion to choose between these

data sets.

_____

[23] The plaintiff in Dorbest I presented evidence that the Indian domestic furniture industry did not utilize some types of mirrors imported under the relevant HTS classification reflected in the WTA. See Dorbest I, 30 CIT at 1698-90, 1694, 1697-98 & n.17, 1699, 462 F. Supp. 2d at 1279-80, 1283, 1286 & n.17, 1287. See also Longkou, __ CIT at __, 581 F. Supp. 2d at 1361, 1363. These plaintiffs also placed evidence on the record demonstrating that these mirrors were "higher-priced speciality mirrors" and, therefore, these mirrors had "a distortive effect on the valuation of the mirror inputs used in furniture production." Dorbest I, 30 CIT at 1694, 462 F. Supp. 2d at 1283. See also Globe Metallurgical, 2008 WL 4417187, at *5-6; Taian Ziyang, __ CIT at __, 637 F. Supp. at 1149, 1155-56; Zhejiang Native Produce & Animal By-Products Imp. & Exp. Group v. United States, No. 06-00234, 2009 Ct. Intl. Trade LEXIS 64, at *18-19 (CIT June 19, 2009); Zhengzhou, __ CIT at __, 617 F. Supp. 2d at 1324. DunAn did not present Commerce with similar evidence demonstrating cost of production ("COP") distortion.  In fact, the AUV of $300.25 fits well within the range of brass bar prices in India. Globe Metallurgical, Inc. v. United States, No. 07-00386, 2009 Ct. Intl. Trade LEXIS 35, at *11 (CIT May 5, 2009) ("The new value selected by Commerce is well within the range of silica fume prices in India.").

The court's duty, in reviewing Commerce's determination as to whether a certain set of data is the "best available information," is "not to evaluate whether the information Commerce used was the best available, but rather whether a reasonable mind could conclude that Commerce chose the best available information." Goldlink Indus. Co. v. United States, 30 CIT 616, 619, 431 F. Supp. 2d 1323, 1327 (2006). Thus, "[i]f Commerce's determination of what constitutes the best available information is reasonable, then the [c]ourt must defer to Commerce." Id. Accord Fujian Lianfu Forestry Co. v. United States, __ CIT __, __, 638 F. Supp. 2d 1325, 1333 (2009); Zhejiang I, 2008 Ct. Intl. Trade LEXIS 69, at *20; Dorbest I, 30 CIT at 1676-77, 462 F. Supp. 2d at 1269.

Accordingly, because Commerce's reading of the evidence is reasonable, the court rejects DunAn's challenge to Commerce's selection of WTA data, including data on imports from France, Japan, and the UAE.

## B. Commerce's Calculation of Labor Costs

Next, DunAn challenges Commerce's derivation of a wage rate for DunAn's labor using a "regression-based" calculation[24] that included wage rate and income data from countries (a) not economically comparable to China and (b) not significant producers

---

[24] For an explanation of the use of regression models, see Allan G. Bluman, Elementary Statistics: A Step by Step Approach 528-30, 544-46 (6th ed. 2007) and Mario F. Triola, Elementary Statistics 541-45 (10th ed. 2008).

of merchandise comparable to the subject FSV.[25]  DunAn instead

advocates the use of an Indian wage rate as the surrogate wage rate

for DunAn's labor.  For the following reasons, the court sustains

the Department's use of the labor regression model in this

determination.

In its wage rate calculation, Commerce performs a simple

regression to estimate the linear relationship between yearly per

capita gross national income ("GNI/capita")[26] and hourly wage rate

("wage").   To describe this relationship, Commerce uses publicly

available GNI/capita and wage data from 61 market economy

countries.[27] [28]  GNI/capita serves as the independent variable (x)

---

[25] Plaintiff does not challenge the type of regression used
by Commerce, but rather generally challenges, as inconsistent
with the statute, the use of a regression model to calculate
labor.

[26] GNI/capita is equivalent to per capita gross national
product, the latter defined as "the dollar value of a country's
final output of goods and services in a year divided by its
population." Antidumping Methodologies: Market Economy Inputs,
Expected Non-Market Economy Wages, Duty Drawback; and Request for
Comments, 71 Fed. Reg. 61,716, 61,723 (Dep't Commerce Oct. 19,
2006) (quotation marks omitted).

[27] The 61 countries plotted on the 2005 regression are:
Albania; Argentina; Australia; Austria; Belgium; Botswana;
Bulgaria; Canada; Chile; Colombia; Costa Rica; Croatia; Czech
Republic; Denmark; Dominican Republic; Ecuador; Egypt; El
Salvador; Estonia; Finland; France; Germany; Hong Kong, China;
Hungary; Iceland; India; Ireland; Israel; Japan; Jordan;
Kazakhstan; Republic of Korea; Latvia; Lithuania; Luxembourg;
Former Yugoslav Republic of Macedonia; Madagascar; Malta;
Mauritius; Mexico; Mongolia; Netherlands; New Zealand; Nicaragua;
Norway; Panama; Poland; Portugal; Romania; Russian Federation;
Seychelles; Singapore; Slovakia; Slovenia; Spain; Sri Lanka;
Sweden; Switzerland; United Kingdom; United States; and West Bank

and wage as the dependent variable (y);[29] predictably, these

_____

and Gaza Strip. Import Administration, International Trade Administration, United States Department of Commerce, Expected Wages of Selected Non-market Economy Countries (2008), http://ia.ita.doc.gov/wages/05wages/05wages-051608.html#table1 (last visited Apr. 19, 2010).

[28] Commerce utilizes four data sets to regress wage on GNI/capita: country-specific earnings data from the International Labour Organization's Yearbook of Labour Specifics; to account for inflation, country-specific consumer price index data from the International Monetary Fund's ("IMF") International Financial Statistics; IMF International Financial Statistics exchange rates; and country-specific GNI data from the World Bank's World Development Indicators. Commerce uses a "base year" of two years prior to the regression to enter into its calculation. Antidumping Methodologies: Market Economy Inputs, Expected Non-Market Economy Wages, Duty Drawback; and Request for Comments, 71 Fed. Reg. at 61,722; Expected Non-Market Economy Wages, 70 Fed. Reg. 37,761, 37,762 (Dep't Commerce June 30, 2005) (request for comment on calculation methodology). The regression was performed in 2008, and, given lag time in availability of data, the base year was 2005. Factor Valuations Prelim. Mem. at 8; (Pl.'s Br. 36 n.*.) Commerce used the base year average exchange rates to convert the GNI and earnings data into U.S. Dollars. Decision Mem. at 17.
     Commerce uses these data sets to obtain a "complete picture of labor in the particular market economy," and, therefore, attempts to use data including coverage of, among other things, all types of industries in the respective country. Decision Mem. at 17; Antidumping Methodologies: Market Economy Inputs, Expected Non-Market Economy Wages, Duty Drawback; and Request for Comments, 71 Fed. Reg. at 61,721. In other words, the labor data used is not industry-specific and "the value for labor will be the same in every proceeding [in a given year] involving a given NME." Antidumping Methodologies: Market Economy Inputs, Expected Non-Market Economy Wages, Duty Drawback; and Request for Comments, 71 Fed. Reg. at 61,720.
     DunAn has not challenged the use of these data sets in particular, and instead focuses on the overall use of the regression analysis.

[29] The equation is therefore: Wage[predicted] = Y-intercept + slope * GNI/capita[entered]. Antidumping Methodologies: Market Economy Inputs, Expected Non-Market Economy Wages, Duty Drawback; and Request for Comments, 71 Fed. Reg. at 61,723.

variables have a positive linear relationship. Commerce then estimates the wage for an NME country by using the NME GNI/capita.

Accordingly, although Commerce used Indian data for other FOPs, in calculating a 2005 surrogate wage for merchandise from China, Commerce regressed 2005 market economy wages on 2005 GNI/capitas, as follows:



Plot of NME Wage Regression Line and Market-Economy Wage Data

◆ Actual, Infl.-Adj. Market-Economy Wage, 2005 USD/hr.          ——Linear (Est. NME Wage, 2005 USD/hr.)

Expected Wages of Selected Non-Market Economy Countries, *supra* note 27. Thus, Commerce created a 2005 NME regression line equation to describe the relationship between the 61 countries' wages and GNI/capita:

**Wage[predicted] = 0.257585 + 0.000448 * GNI/capita[entered]**

See id. Because Commerce estimates that NME countries's GNI/capita and wages would have the same relationship, Commerce used the same regression line to also describe predicted NME wages:

**NME wage[predicted] = 0.257585 + 0.000448 * NME GNI/capita[entered]**

See id. That is to say, by entering in an NME's GNI/capita, Commerce could predict the NME's wages.

Using this equation, Commerce then entered China's 2005 GNI/capita -- $1,740 -- into the above equation and derived a wage of, approximately, $1.04.[30] Id. Commerce selected this surrogate wage rate as the labor FOP for the calculation of DunAn's COP. DunAn notes that, had Commerce limited its surrogate values to that of India as it did for other FOPs, DunAn's surrogate wage would have instead amounted to $0.21. (Pl.'s Br. 39;) Expected Wages of Selected Non-Market Economy Countries, *supra* note 27.

Like the plaintiff in Dorbest I and in the subsequent decision post-remand, Dorbest Ltd. v. United States ("Dorbest II"), __ CIT __, 547 F. Supp. 2d 1321 (2008), DunAn attacks 19 C.F.R. § 351.408(c)(3) as invalid both facially and as-applied in this case.[31] The court will address each of DunAn's arguments in turn.

---

[30] *I.e.,* 0.257585 + 0.000448 * 1740 = 1.037105 ≈ 1.04.

[31] Dorbest I and Dorbest II are on appeal to the Federal Circuit on the issue of the validity of the labor regression

## 1. Facial Challenge

First, DunAn argues that Commerce's regulation is contrary to the statute and, therefore invalid on its face.  Following <u>Dorbest I</u>, the court rejects DunAn's facial challenge.[32]

> Section 1677b does, of course, require Commerce to
>
> utilize, to the extent possible, the prices or costs of factors of production in one or more market economy countries that are --
>
>> (A) at a level of economic development comparable to that of the nonmarket economy country, and
>>
>> (B) significant producers of comparable merchandise.

19 U.S.C. § 1677b(c)(4).  Commerce's regulation -- providing for the use of "regression-based wage rates reflective of the observed relationship between wages and national income in market economy

_____

regulation. No. 2009-1257 (Fed. Cir. Mar. 18, 2009).

[32] In <u>Dorbest I</u>, plaintiff Dorbest, like DunAn, argued that the statute mandated that Commerce input only countries that fulfilled the economic comparability category.  In addressing that challenge, the court assumed, *arguendo*, that Dorbest's reading of the statute was correct, holding that:

> Although Commerce's regulation does not specifically provide that Commerce must choose comparable market economies, it does not suggest the opposite either. Rather, the regulation is silent as to how Commerce will select market economies for its data set. As such, even if . . . the antidumping statute permits use of data only from comparable market economies, Commerce could conceivably be faithful to both its regulation and [this] interpretation of the antidumping statute by using data from only comparable market economies.

<u>Dorbest I</u>, 30 CIT at 1705, 462 F. Supp. 2d at 1292.

countries" -- is not, on its face, inconsistent with the statutory requirement for use of prices or costs from a market economy country.    Rather, consistent with the statute, Commerce's regulation derives a wage rate for a "hypothetical" market economy China, that is, a market economy country with China's level of economic development and that produces merchandise comparable to the Chinese merchandise at issue. See Nation Ford Chem. Co. v. United States, 166 F.3d 1373, 1378 (Fed. Cir. 1999)("§ 1677b(c)'s goal [is] constructing a hypothetical 'market value' representative of the foreign producers under investigation"). See also Shakeproof Assembly Components Div. of Ill. Tool Works, Inc. v. United States, 268 F.3d 1376, 1381 (Fed. Cir. 2001) (according Commerce discretion to depart from surrogate country valuation "when there are other methods of determining the 'best available information' regarding values of [FOPs].").

DunAn attempts to distinguish Dorbest I on the grounds that Dorbest I did not address the substantial producer prong of section 1677b(c).    However, the court's reasoning for economic comparability applies equally to the significant producer requirement, as to choice of an underlying data set, should such a requirement indeed exist.  Therefore, Dorbest I is persuasive here.

DunAn also attacks Dorbest I by highlighting an excerpt from the legislative history of section 1677b(c).  DunAn cites the Conference Agreement discussion of this provision contained in the

Omnibus Trade and Competitiveness Act of 1988: "[t]he [FOPs] would be valued from the best available evidence in a market economy country (or countries) that is at a comparable level of economic development as the country subject to investigation and is a significant producer of the comparable merchandise." H.R. Rep. No. 100-576, at 590 (1988) (Conf. Rep.), reprinted in 1988 U.S.C.C.A.N. 1547, 1623. But the language from the Conference Report does not provide any more guidance than the wording of section 1677b(c), nor has DunAn demonstrated that the Report is in any way inconsistent with the court's reading of the statute.

Finally, DunAn points the court to other decisions from this Court that have invalidated 19 C.F.R. § 351.408(c)(3) as an impermissible and unreasonable implementation of section 1677b(c). See, e.g., Taian Ziyang, __ CIT at __, 637 F. Supp. 2d at 1136-38; Allied Pac. Food (Dalian) Co. v. United States ("Allied Pac. II"), __ CIT __, 587 F. Supp. 2d 1330 (2008). These opinions take the position that the regulation is invalid because it precludes Commerce from considering investigation- and product-specific wage data. See Allied Pac. II, __ CIT at __, 587 F. Supp. 2d at 1356 ("The regulation requires a single calculated wage rate to be determined annually . . . . [and therefore] [t]he regulation does not permit a surrogate labor rate to be determined for an individual proceeding"), 1358 ("Commerce's response in the preamble [to the regulation] falls short of a plausible explanation of why

Commerce considered it acceptable to foreclose consideration of data specific to the type of labor required to produce comparable merchandise. . . . [Commerce's] rationale [is] insufficient to justify a regulation that disallows the use of data on the cost of a specific type of labor"). But the statute imposes a data selection requirement of country comparability, not merchandise specificity; nor does the statute require the use of data generated for an individual or specific investigation. See 19 U.S.C. § 1677b(c)(4) (Commerce "shall utilize . . . the prices or costs of factors of production in one or more market economy countries that are . . . significant producers of comparable merchandise").[33] Consequently, the Department's labor rate regulation is not, on its

---

[33] Moreover, assuming *arguendo* that the statute does not contemplate a hypothetical market economy China, it is far from clear that -- despite the fact that Commerce calculates labor wage rates "each year" -- Commerce cannot limit its data set, through an investigation, to those countries that satisfy the statutory criteria. Whether Commerce should so limit its data set or should instead include a broad set of data such as that used in this case, that is, which set of data qualifies as the "best available information," goes to Commerce's application of section 351.408(c)(3) rather than to the regulation's facial validity. See Wash. State Grange v. Wash. State Republican Party, 552 U.S. 442, 449 (2008) ("a plaintiff can only succeed in a facial challenge by establishing that no set of circumstances exists under which the [regulation] would be valid" (citation, quotation marks, & alteration omitted)); Preminger v. Sec'y of Veterans Affairs, 517 F.3d 1299, 1311 (Fed. Cir. 2008) ("A facial challenge to a statute or regulation is independent of the individual bringing the complaint and the circumstances surrounding his or her challenge. . . . In contrast, an as-applied challenge is specific to the facts of the particular individual involved in the suit." (citations & quotation marks omitted)).

face, inconsistent with the statute.

## 2. As-Applied Challenge

Second, DunAn argues that the Department should have used the Indian wage rate in lieu of the number for China's wage rate derived from the regression.  In this regard, DunAn does not attack the methodology Commerce used in implementing the regulation and does not, other than challenging the legality of the regression model, explain how the Indian wage rate instead constitutes the "best available information."  Rather, DunAn argues that Commerce did not explain how use of global regression-based calculation has produced a wage rate that is more accurate for the valuation of labor in the FSVs industry. (See Pl.'s Br. 39-40; Pl.'s Reply Br. 15.)

But Commerce did in fact explain its reasoning on this issue:

> While surrogate values for other FOPs are selected from a single surrogate country, due to the gross variability between wage rates and GNI, we do not find reliance on wage data from a single surrogate country reliable for purposes of valuing the labor input. While there is a strong positive correlation between wage rates and GNI, there is also variation in the wage rates of comparable market economies. For example, even for countries that are relatively comparable in terms of GNI for purposes of factor valuation (e.g., where GNI is below US$ 2500), the wage rate spans from US$ 0.21 to US$ 2.06. To further illustrate, DunAn advocates that instead of relying on the regression methodology, the Department should value labor using India's single wage rate. Petitioner contends that should the Department consider valuing labor from a single surrogate, other comparable countries should also be considered, such as [Colombia]. Although both India and [Colombia] have GNIs of under US $2500, India's wage rate is approximately US $0.21, as compared to [Colombia's] observed wage rate of US $1.13. The large

variance in these two countries' wages—not to mention the variances which occur when wage rates are considered for other market economy countries of economic comparability— illustrate the arbitrariness of relying on a wage rate from a single country. For these reasons, DunAn's suggestion of using a single surrogate country to value labor does not constitute the best available information.

Decision Mem. at 20 (citations omitted).

Moreover, earlier in its Decision Memo, Commerce explained the benefits of its global regression model: "[t]he Department . . . considers that the regression methodology constitutes the best available information for purposes of valuing labor" as "[t]he Department's methodology avoids extreme variances in labor wage rates that exist across market economies, and instead, accounts for the global relationship between GNI and wages." Id. at 17. Further:

relying only on data from countries that are economically comparable to each NME would undermine, rather than enhance, the accuracy of the Department's regression analysis. The number of "economically comparable" countries would be extremely small. For example, when examining countries with GNIs that range between US $700 and US $2500 (e.g., countries that might be considered economically comparable to [China]), there are just nine countries out of a full data set of 61 countries used in the revised wage calculation in May 2008. A regression based on such a small subset of countries would be highly dependent on each and every data point, and thus, the inclusion or exclusion of any one country could have an extreme effect on the regression results from case-to-case, and from year-to-year. Relying on a broad data set, as opposed to data from just the economically comparable countries, maximizes the accuracy of the regression results, minimizes the effects of the potential year-to-year variability in the basket, and provides predictability and fairness. . . .

[T]he purpose in using a regression methodology . . . is

> to provide a more accurate labor value that is stable and predictable across all cases. The regression methodology accomplishes this by providing a variable average that "smoothes out" the variations in the data and permits, in a predictable manner, the estimation of a market economy wage rate relative to a level of GNI that is as accurate as practicable, with the least amount of volatility across cases.

Id. at 19 (citations & footnote omitted).

Considered in light of Commerce's analysis, DunAn did not create a record establishing that the particular Indian surrogate value, $0.21/hour, would somehow be more accurate, and thus better information, than the regression surrogate value derived for China. Compare Dorbest II, __ CIT at __, 547 F. Supp. 2d at 1328-30 (analyzing plaintiffs' argument that the regression was heteroscedastic); Dorbest I, 30 CIT at 1710-12, 462 F. Supp. 2d at 1296-98 (addressing plaintiffs' arguments that the regression model is distorted given the existence of a non-zero y-intercept). Contrary to DunAn's arguments, Commerce's explanation reasonably supports Commerce's use of the broader global regression methodology and preference for the wage rate selected here when compared to India's surrogate wage rate. See Dorbest I, 30 CIT at 1677, 462 F. Supp. 2d at 1269 (Commerce must "justify its selection of data with a reasoned explanation."). There is nothing on the record here that would preclude a reasonable mind from preferring the regression-generated wage rate to the specific India-based $0.21 rate.

Accordingly, the court affirms Commerce's use of the

regression model in calculating the FOP for labor in this case.

## C. Partial AFA Applied as to DunAn U.S. Sales and ICC

DunAn next challenges, as unsupported by substantial evidence on the record, Commerce's decision to apply partial AFA -- to DunAn's reported U.S. December 2007 sales and to the ICC for the months of October through December 2007 -- because the Department was unable to verify the data DunAn submitted.[34]  As the court will explain, the court also affirms this aspect of the Department's final determination.

## 1. Commerce's Verification of DunAn's U.S. Sales and ICC

The court begins with a summary of the relevant facts at issue during Commerce's verification of DunAn's POI U.S. sales of FSVs.

During the POI and beyond, Dunan's U.S. subsidiary, DunAn Precision, Inc., and a U.S. customer had a purchasing agreement whereby the customer maintained quantities of imported DunAn FSV inventory in the customer's U.S. warehouse.  Each month, the customer withdrew FSVs out of the warehouse as needed, and reported the number of used inventory (or "usage") to DunAn Precision. According to DunAn, DunAn Precision would review these "consumption reports" for accuracy, and, if correct, would invoice the customer for the values on the consumption report each month. (Pl.'s Br. 15-16;) Application of Partial Adverse Facts Available for Zhejiang

---

[34] Commerce is required to verify "all information relied upon" in making its final determination. 19 U.S.C. § 1677m(i)(1).

DunAn Precision Industries Co., Ltd., Zhejiang DunAn Hetian Metal Co., Ltd. and their U.S. Subsidiary DunAn Precision Inc. in the Antidumping Investigation of Frontseating Service Valves ("FSVs") from the People's Republic of China, A-570-933, POI 7/1/07 - 12/31/07 (Mar. 6, 2009), Admin. R. Conf. Doc. 228 ("Application of AFA Mem."), at 2-3.  If the consumption reports were inaccurate,[35] DunAn Precision would invoice the customer at the correct value, and "would keep a record of the discrepancy and invoice [the customer] on the corrected quantity." (Pl.'s Br. 16.) Accord Application of AFA Mem. at 2, 3.  Thereafter, based on the customer's recent consumption and projected upcoming needs, DunAn Precision would issue FSV orders to DunAn. Application of AFA Mem. at 3.

During verification, DunAn submitted to Commerce DunAn Precision's invoices and financial statements together with a "Sales Reconciliation" worksheet harmonizing the two. Verification of the U.S. sales questionnaire responses of Zhejiang DunAn Precision Industries Co., Ltd., Zhejiang DunAn Hetian Metal Co., Ltd., and their U.S. subsidiary DunAn Precision Inc. in the Antidumping Investigation of Frontseating Service Valves ("FSVs") from the People's Republic of China, A-570-933, POI 7/1/07 - 12/31/07 (Jan.

---

[35] During the POI, Mr. Shu, the DunAn Precision general manager, verified the accuracy of the consumption report by forwarding the report to Mr. Han, an engineer, who compared the report with the physical FSV inventory in the warehouse. Application of AFA Mem. at 2.  During Commerce's investigation and verification, DunAn Precision's general manager was Mr. Qi. Id.

15, 2009), Admin. R. Conf. Doc. 254 ("Verification Mem."), at 7. DunAn noted that payment received from its customer in December 2007 was thirty cents less than the value on its December 2007 invoice, but, at the time, provided no reason for this seemingly minor discrepancy.[36] Application of AFA Mem. at 3.

Subsequently, in its investigation into other DunAn Precision sales records, Commerce discovered that, for the month of December 2007, the consumption report and the invoice did not match. Although the total value noted in the invoice deviated by only thirty cents from the consumption report -- consistent with the December 2007 discrepancy between payment and invoice noted above -- the quantities in the December 2007 consumption report differed significantly from those in the invoice. Verification Mem. at 8; Application of AFA Mem. at 3. Specifically, the consumption report quantity for one FSV model vastly exceeded that in the invoice, and, for another FSV model, the invoice quantity vastly exceeded that in the consumption report.[37] Application of AFA Mem. at 5; Decision Mem.

_____

[36] DunAn Precision also informed Commerce of a misclassification, as income, of a $[[      ]] security deposit; Commerce confirmed this misclassification. Verification Mem. at 7.

[37] For December 2007, the consumption report indicated a quantity of [[      ]] pieces of FSV model [[         ]] whereas the invoice noted [[      ]] pieces of this model; this is a difference of [[      ]] pieces. Verification Mem. at 8. Also for December 2007, the consumption report recorded a quantity of [[      ]] pieces of FSV model [[         ]] as opposed to the invoice number of [[      ]], a difference of [[      ]]. Application of AFA Mem. at 3.

at 49-50.

Commerce asked for an explanation of these discrepancies. Mr. Qi responded that he did not have one. Verification Mem. at 8. Later, he told Commerce that he "remembered" that "when he first received the December 2007 [] monthly consumption report, he noticed an abnormally large withdrawal" of a certain FSV model;[38] after verifying that the amount in the consumption report was inaccurate, he corrected the error with the customer. Id. Accord Application of AFA Mem. at 3. However, DunAn did not have any record of the discrepancy and correction, despite DunAn Precision and Mr. Qi's policy to maintain such documentation. Verification Mem. at 8; Application of AFA Mem. at 2, 3. Moreover, Mr. Qi did not explain this deviation from policy and claimed not to know the location of any of Mr. Han's reports. Application of AFA Mem. at 3.

The only document DunAn voluntarily produced as to the discrepancy was an e-mail exchange between Mr. Han and an employee of the U.S. customer, in which the latter sent the consumption report, asking Mr. Han to "[p]lease review this and confirm this payment is accurate." U.S. Sales Verification Ex. 7. Mr. Han responded that "[t]he numbers showing on the report of the month of Dec.[ are] right [and] [p]lease go ahead [and] arrange the payment." Id. DunAn explained that the e-mail shows an assent to value rather than quantity. Verification Mem. at 9; Application of AFA Mem. at

---

[38] Model No. [[            ]]

4.   DunAn also claimed that the U.S. customer likely misreported numbers on its consumption reports for financial reasons.[39]  Further, DunAn argued that the consumption report numbers were abnormally large in comparison to other 2007 orders,[40] and, in any event, it would have been impossible for the customer to withdraw so many of the relevant model of FSVs from inventory, as DunAn Precision did not have enough of the model in stock.[41] Verification Mem. at 10;

---

[39] According to DunAn, the U.S. customer [[


]]. Verification Mem. at 10. Accord Application of AFA Mem. at 4.  In other words, the customer [[


]]. Verification Mem. at 10. Accord Application of AFA Mem. at 4. Despite this business tactic, however, DunAn Precision [[



]]. Verification Mem. at 10. Accord Application of AFA Mem. at 4.  During verification, Commerce confirmed the [[                              ]] and the U.S. customer's [[                                ]]. Verification Mem. at 10; Application of AFA Mem. at 5.

[40] DunAn noted that "the consumption alleged for a *single day* in December for [[                    ]] was [[          ]] units, which far exceeded the daily total for any other day and, in fact, exceeded the entire monthly total for this model in other months." (Pl.'s Br. 18.)  [[         ]] is twenty times greater than the average usage for this model. (Id. 25.)

[41] Taking into account consumption reports through November 2007, DunAn Precision usage in 2007, and imports through December 7, 2007, the quantity of the relevant FSV model in warehouse inventory available to the U.S. customer, adjusted by Commerce, totaled [[         ]], which is [[         ]] less than the customer's December 2007 consumption report. See supra note 37; Verification

Application of AFA Mem. at 5.

Confusing matters further, however, Mr. Qi maintained separate "monthly inventory reports" or "MIRs," which Commerce obtained for the months October 2007 through March 2008.[42] [43]  Conspicuously, the January 2008 MIR was singularly structured. Verification Mem. at 11; Application of AFA Mem. at 5-6.  Unlike the other MIRs, the January 2008 MIR did not account for the final inventory from the previous month, that is, the report did not account for December 2007 inventory remaining after subtracting out the U.S. customer's purchases that month; the January MIR instead used the U.S. customer's consumption numbers.[44]  Verification Mem. at 11-12;

_____

Mem. at 10-11; U.S. Sales Verification Ex. 7; (Pl.'s Br. 18.)

[42] Significantly, DunAn Precision's outside accountant used the MIRs as the basis for inventory on the balance sheet and for costs of sales calculation in the income statement. Verification Mem. at 12-13; Application of AFA Mem. at 6.

[43] Mr. Qi also kept a worksheet on his computer allowing him to compare 2007 and 2008 sales in order to project future FSV demand. Verification Mem. at 8.  The total 2007 quantity differed from the total 2007 quantity provided in the monthly invoices. Id.  Mr. Qi stated that he did not know where the numbers came from except that another employee provided them to him. Id.  The employee had no record of these 2007 numbers, and also could not determine the source of the quantity figures contained in Mr. Qi's worksheet. Id.

[44] In describing the MIRs, Commerce explained that:

each [MIR], other than January 2008, was similarly structured: the first column is total inventory from the previous month, the second column is inventory received during the current month, the third column is the total of the previous two columns, the fourth column is the usage during the current month, and the

Application of AFA Mem. at 5-6.  The remaining 2008 MIRs carried

over the sales from December 2007, but the amount carried over still

came from the December consumption report, not the December

invoice.[45]  Verification Mem. at 12; Application of AFA Mem. at 6.

---

> fifth column is the total ending inventory (the third
> column total minus the fourth column usage).  This last
> column is then carried over to the next month's DunAn
> Precision [MIR] as the first column.

Verification Mem. at 11.  But as to the January 2008 MIR:

> the first column . . . is not the same as the last
> column of the December report, i.e., the ending
> inventory from December 2007.  Rather, the first column
> of the January 2008 DunAn Precision [MIR] is the same
> as the third column of the December 2007 DunAn
> Precision [MIR], i.e., the total inventory in December
> before usage is deducted. Therefore, the last two
> columns of the December 2007 DunAn Precision [MIR],
> including December usage, which consists of the
> quantities reported by DunAn in its sales
> reconciliation, is excluded from the inventory
> calculation starting in January 2008.
>
>      Secondly, the January DunAn Precision [MIR] has an
> additional column that the other reports do not have: a
> column for the usage of the previous month: December
> 2007.  We noted that the December 2007 usage column in
> January 2008 DunAn Precision [MIR] contained the
> quantity figures from the [U.S. customer] monthly
> consumer report, not the quantities from the December
> 2007 sales invoice.  Thus, the January 2008 DunAn
> Precision [MIR] begins with the total inventory of
> December 2007 (without the deduction of December 2007
> usage), and then deducts December 2007 usage based on
> the [U.S. customer] monthly consumption report figures,
> and January 2008 usage.

Id. at 11.

    [45] Commerce "examined the DunAn Precision [MIRs] for February
and March 2008, to see if [they] were reconciled to include the
allegedly correct quantity figures from the December 2007 DunAn

Commerce was concerned that this MIR structure, by eliminating December 2007 net inventory, served to side-step, rather than to reconcile, the very quantity discrepancies at issue. Verification Mem. at 12; Application of AFA Mem. at 6. At first, Mr. Qi could not provide any explanation for the difference in the January 2008 MIR or how the MIRs resolved the quantity/inventory December 2007 conundrum and could not even remember making the report. Verification Mem. at 9, 12. Mr. Qi finally answered that DunAn Precision reported its numbers in that way for tax reasons.[46] Verification Mem. at 12.

In essence, Mr. Qi admitted that the inventory numbers contained in the October, November, and December 2007 MIRs were

Precision [MIR]." Verification Mem. at 12. Commerce "note[d] that [these MIRs] were not [so reconciled], and the December 2007 [U.S. customer] monthly consumption figures were carried forward." Id.

[46] As to DunAn Precision's purported tax reasons for the January 2008 MIR, Mr. Qi informed the Department that DunAn Precision [[

]]
although it must, in accordance with its agreement with its U.S. customer "keep four to six weeks of inventory on hand at all times." Verification Mem. at 12; Application of AFA Mem. at 6. Because DunAn Precision [[

]]
Verification Mem. at 12. Thus, DunAn Precision must continue receiving inventory but [[

]], Verification Mem. at 12, that is, it [[

]]. Application of AFA Mem. at 6.

incorrect.  But while Commerce pointed out that this recordation of inventory indicated that the consumption reports were accurate, Mr. Qi again, without explanation, maintained that the invoice quantities were correct. <u>Verification Mem.</u> at 12.  Mr. Qi still refused to answer why consumption report numbers, rather than invoice numbers, were used in the MIRs, except to indicate that the U.S. customer [[                                                        ]]. <u>Application of AFA Mem.</u> at 6.

As a result of the Commerce's inability to verify DunAn's conflicting sales data for December 2007, and because of DunAn's lack of clarity regarding these data, Commerce applied AFA to DunAn's December 2007 entries at an AD margin of 55.62  -- the margin from the initiation and the highest margin calculated for the proceeding. <u>Decision Mem.</u> at 52.  Moreover, because Mr. Qi provided evidence that inventory numbers were incorrectly reported in the MIRs for the latter three months of 2007, Commerce applied AFA as to the ICC for these months and used the highest ICC expense calculated for any sale during the POI. <u>Id.</u>

**2. Analysis**

**a. Application of "Facts Otherwise Available"**

The administrative record contains substantial evidence supporting Commerce's application of AFA as to the December 2007 sales.  In accordance with 19 U.S.C. § 1677e(a)(2)(D), Commerce noted significant irreconcilable differences, in December sales,

between the consumption reports and the invoices, and thus could not

verify these sales numbers.[47]

When a respondent has not provided Commerce with accurate,

verifiable record evidence, the statutory provision for application

of facts otherwise available is intended to permit Commerce to fill

the gap. Ningbo Dafa Chem. Co. v. United States, 580 F.3d 1247, 1255

(Fed. Cir. 2009); Statement of Administrative Action, H.R. Rep. No.

103-316, at 869 (1994) ("SAA"), reprinted in 1994 U.S.C.C.A.N. 4040,

4198. See also Nippon Steel Corp. v. United States, 337 F.3d 1373,

1381 (Fed. Cir. 2003); Dorbest I, 30 CIT at 1737, 462 F. Supp. 2d at

1318 ("Section 1677e(a) requires that there be a gap in the record

---

[47] Commerce may use "facts otherwise available" in reaching its determination, specifically where:

>    (1) necessary information is not available on the record, or
>
>    (2) an interested party or any other person–
>
>    (A) withholds information that has been requested by the administering authority or the Commission under this title,
>
>    (B) fails to provide such information by the deadlines for submission of the information or in the form and manner requested, subject to . . . [other provisions not relevant here],
>
>    (C) significantly impedes a proceeding under this title, or
>
>    (D) provides such information but the information cannot be verified as provided in [19 U.S.C. § 1677m(i)] . . . .

19 U.S.C. § 1677e(a). Accord 19 C.F.R. § 351.308(a).

of verifiable information due to a party's failure to supply necessary or reliable information in response to an information request from Commerce" (citing NTN Bearing Corp., 368 F.3d at 1377 ("All that is required is that the necessary information be unavailable on the record."))(other citations omitted)). Accordingly, Commerce's use of facts otherwise available is warranted when Commerce cannot verify the accuracy of respondent's data or cannot reconcile the information produced. 19 U.S.C. § 1677e(a); Heveafil Sdn. Bhd. v. United States, 58 F. App'x 843, 847-48 (Fed. Cir. 2003). As to its procedures for verifying information provided in respondent's questionnaire responses, Commerce is accorded broad discretion. Heveafil, 58 F. App'x at 847; Micron Tech., Inc. v. United States, 117 F.3d 1386, 1396 (Fed. Cir. 1997).[48]

DunAn points to other documents, separately verified by Commerce, such as the invoices and consumption reports through November, that purportedly demonstrate the accuracy of its December invoices. Because of these other invoices and documents, DunAn claims that no "gaps" existed on the record to justify the use of AFA.[49] DunAn contends that Shandong Huarong Mach. Co. v. United

[48] To the extent DunAn rejects Commerce's administration of the verification, DunAn has presented the court with no evidence that Commerce acted arbitrarily in these proceedings.

[49] DunAn also argues that, because Commerce accepted the date of invoice as the date of sale for its calculations, Commerce should have accepted the sales listed on the invoice only. The court agrees with the government that the date of sale does not wed Commerce to accepting invoice amounts at face value despite

States, 30 CIT 1269, 435 F. Supp. 2d 1261 (2006) supports the conclusion that, because it provided Commerce with "necessary information," Commerce could not apply facts otherwise available. Shandong, 30 CIT at 1301-02, 435 F. Supp. 2d at 1289.

The government responds, however, that, when attempting to verify the accuracy of sales and ICC, Commerce "discovered documents that contradicted those previously provided to it." (Def.'s Br. 17.) Because of these inconsistencies, Commerce was unable to verify the information on the record and could not rely on the accuracy of DunAn's documentation. The government also argues that DunAn's consumption reports prior to December 2007 are not relevant to the question of whether records for December 2007 were accurate, and shipment records only display import numbers and do not account for the debated consumption numbers. (Id. 21.) As to DunAn's complaints that Commerce did not utilize the consumption reports instead of the invoices, the government argues that Commerce did not accept the accuracy of the consumption reports, but, rather, determined that the consumption reports indicated contradictions in DunAn Precision's records that prevented Commerce from verifying the December sales numbers. (Id. 21-22.)

---

significant discrepancies in the documentation.  Nor does the choice of date of sale render the consumption report numbers irrelevant, as it was DunAn Precision's practice to review the consumption reports for accuracy and, after recording inconsistencies, invoice its customer based on these data. Moreover, DunAn Precision's own January 2008 accounting records conflicted with the December invoice numbers.

The government is once again correct.  Nothing in Shandong indicates that Commerce may not apply facts otherwise available when information is unverifiable; unverifiable "necessary information" creates a "gap" in the administrative record to the same degree as a complete absence of "necessary information."  See Heveafil, 58 F. App'x at 847-48. See also SAA at 869, reprinted in 1994 U.S.C.C.A.N. at 4198. Such information is still "missing" from the record that would serve to verify the contradictory sales numbers.  A respondent's submission of unverifiable evidence, rather than no evidence at all, does not save the respondent from Commerce's reasonable use of facts otherwise available.[50]  In any event, the court would direct DunAn to read the clear and unambiguous language of section 1677e(a) that instructs that facts otherwise available are appropriate either when "necessary information is not available on the record" or when "an interested party or any other person . . . provides such information but the information cannot be verified . . . ." 19 U.S.C. § 1677e(a).

For the same reason, as to ICC, the court cannot mandate that Commerce ignore purportedly unreliable statements made by Mr. Qi in favor of what Commerce has reasonably determined to be unverifiable

---

[50] As Defendant-Intervenor points out, "[i]f DunAn's argument were taken to its illogical conclusion, all a respondent would have to do to overcome application of [AFA] for failing to provide information, would be to supply any information, even if it were false and unverifiable." (Def.-Intervenor's Opp'n to Pl.'s Rule 56.2 Mot. for J. Upon the Agency R. ("Def.-Intervenor's Br.") 14.)

information.

Finally on this issue, DunAn argues that the inventory reports show that it was impossible to fulfill the consumption reports' requirements, and claims that the December 2007 withdrawal was clearly so large as to be aberrational. Commerce replied to DunAn's concerns that "DunAn attempts to demonstrate the accuracy of its records by pointing to the very records that could not be substantiated at verification." Decision Mem. at 51.[51]

The court again agrees with the government's position.  Given that, for the relevant valves, Commerce could verify neither the exact number of December 2007 sales nor the total inventory in stock between October and December 2007, it is reasonable for Commerce to decline to square alleged December inventory amounts and sales, even in light of DunAn's proffered import data and even assuming, *arguendo*, that this import information is correct.  Moreover, because its December 2007 sales were unverifiable and because of Mr. Qi's admission,[52] it was also within Commerce's discretion to refuse

---

[51] DunAn also disputes Commerce's finding that "the withdrawals on DunAn's inventory reports cover a broad range of quantity, and while the monthly withdrawal in question is the largest, we do not find that it is so much larger than the others as to be anomalous, and indicate that it is inaccurate." Decision Mem. at 51.  As the court determines that Commerce's reasoning, regarding problems with verification of December sales, was supported by substantial record evidence, the court need not address this further factual finding.

[52] Mr. Qi admitted that [[

]]. See *supra*.

to find that anomalies in December sales numbers definitively either verified or discredited the accuracy of various other information on the record.

As such, Commerce's use of facts otherwise available, as to the December 2007 sales and ICC, is sustained.

### b. Application of Adverse Inferences

The administrative record also reflects that Commerce supported, with substantial evidence, its decision that DunAn did not act "to the best of its ability" to aid Commerce in resolving record discrepancies. 19 U.S.C. § 1677e(b).[53]

In making its determination whether or not to utilize an adverse inference, Commerce need only make a "factual assessment of the extent to which a respondent keeps and maintains reasonable records and the degree to which the respondent cooperates in investigating those records and in providing Commerce with the requested information." Nippon, 337 F.3d at 1383. Moreover, there is no *mens rea* requirement to warrant an adverse inference, and Commerce may use adverse facts regardless of a respondent's motivation or intent. Id.

---

[53] Commerce may "use an inference that is adverse to the interests of [the interested party]" if Commerce "finds that an interested party has failed to cooperate by not acting to the best of its ability to comply with [Commerce's] request for information." 19 U.S.C. § 1677e(b). Accord 19 C.F.R. § 351.308(a). The adverse inference "may include reliance on information" from the petition, a final determination in the same investigation, or "any other information placed on the record." 19 U.S.C. § 1677e(b). Accord 19 C.F.R. § 351.308(c).

The statutory standard does not require perfection; nonetheless, though mistakes may sometimes be discounted, a respondent cannot be "inattentive[], careless[], or inadequate [in] record keeping." Id. at 1382. Commerce may presume that a respondent is familiar with its own records. Id. Commerce may also assume that respondents are familiar with rules and regulations that apply to the import activities undertaken. Id. As a consequence, in order to avoid an adverse inference, a respondent must:

> (a) take reasonable steps to keep and maintain full and complete records documenting the information that a reasonable importer should anticipate being called upon to produce; (b) have familiarity with all of the records it maintains in its possession, custody, or control; and (c) conduct prompt, careful, and comprehensive investigations of all relevant records that refer or relate to the imports in question to the full extent of the importers' ability to do so.

Id.

Errors resulting in failure to provide information (*e.g.*, computer errors or mistaken advice from an attorney) will not absolve a respondent from a Commerce determination that the respondent has failed to cooperate. See PAM, S.p.A. v. United States, 582 F.3d 1336, 1339 (Fed. Cir. 2009). A respondent may not rely on excuses that its employee designated to prepare the response either does not know about the needed records, Nippon, 337 F.3d at 1383, or has a lack of familiarity with the respondent's accounting records. Heveafil, 58 F. App'x at 849. Nor can the respondent avoid adverse inferences if it finds that records no longer exist or

cannot be located. See id.

DunAn argues that DunAn Precision merely failed to maintain sufficient records to account for discrepancies between consumption reports and invoices. These failures, however, even if inadvertent, support Commerce's decision to apply an adverse inference. See Nippon, 337 F.3d at 1383. Further, Commerce met with Mr. Qi several times and, in some instances, Mr. Qi could not explain the inconsistencies in DunAn Precision's documents. Of those inconsistencies for which he could account, Mr. Qi informed Commerce that DunAn Precision made adjustments in its accounting records -- also provided to Commerce -- but, at the same time, kept MIRs that conflicted with the invoices. Yet Mr. Qi continued to insist that the invoices were correct. This lack of clarity indicates, at best, negligent record keeping, inadequate knowledge of existing records, insufficient inquiry into these records, and failure to adequately prepare Mr. Qi for Commerce's investigation. See id.; Heveafil, 58 F. App'x at 849; PAM, 582 F.3d at 1339.

DunAn once again relies on Shandong, 30 CIT at 1301-02, 435 F. Supp. 2d at 1288-89, as support for its position.[54] But, consistent with Shandong, it is within Commerce's discretion to make factual

---

[54] The Shandong court upheld Commerce's decision because, on the record, it was reasonable for Commerce to refuse to apply AFA in light of its determination that "SMC complied with [the Department's] requests for documentary evidence regarding its ocean freight expenses . . . ." Shandong, 30 CIT 1301, 435 F. Supp. 2d at 1289 (quotation marks omitted).

conclusions based upon the administrative record so long as a reasonable fact finder could make such conclusions. DunAn has not demonstrated to the court that, on this administrative record, a reasonable fact finder could not come to the conclusion that Commerce reached here. See U.S. Steel Group, 96 F.3d at 1357-58; In re Alonso, 545 F.3d 1015, 1019 (Fed. Cir. 2008).

On the record before the court, it was reasonable for Commerce to find that either DunAn was not completely forthcoming to Commerce or that DunAn Precision was at least negligent with its record keeping. Therefore, the court sustains Commerce's application of an adverse inference against DunAn.

### c. Use of AFA Margin of 55.62 percent[55]

DunAn also contests the resulting AFA rate. Commerce applied a 55.62 percent dumping margin to DunAn's December 2007 sales of the two FSV models at issue, as 55.62 percent was the initiation rate and the highest rate in the proceeding. Application of AFA Mem. at 9; Decision Mem. at 52.[56]

The statute explicitly authorizes Commerce, in determining an appropriate AFA rate, to rely on any information placed on the record, including information derived from the petition. 19 U.S.C.

---

[55] DunAn does not challenge the particular AFA rate applied to the ICC.

[56] 55.62 percent happens to also be the China-wide rate. Frontseating Service Valves from the People's Republic of China, 74 Fed. Reg. at 19,197.

§ 1677e(b); 19 C.F.R. § 351.308; F.lli De Cecco di Filippo Fara S. Martino S.p.A. v. United States, 216 F.3d 1027, 1032 (Fed. Cir. 2000); SAA at 870, reprinted in 1994 U.S.C.C.A.N. at 4199.

That said, Commerce may not "overreach reality" in resorting to an adverse margin. De Cecco, 216 F.3d at 1032. See also PAM, 582 F.3d at 1340; 19 U.S.C. § 1677e(c). When using "secondary information," such as that from the petition, to create a proxy margin, Commerce must "to the extent practicable, corroborate that information from independent sources that are reasonably at [its] disposal." 19 U.S.C. § 1677e(c); 19 C.F.R. § 351.308(d). "Commerce evaluates whether secondary information has probative value by assessing its reliability and relevance." KYD, Inc. v. United States, __ CIT __, __, 613 F. Supp. 2d 1371, 1378 (2009) (citation omitted). See also Mittal Steel Galati S.A. v. United States, 31 CIT 730, 734, 491 F. Supp. 2d 1273, 1278 (2007).

Accordingly, the rate chosen must attempt to be a "reasonably accurate estimate" of respondent's actual rate, "albeit with some built-in increase intended as a deterrent," and must be corroborated with information on the record. De Cecco, 216 F.3d at 1032. See also id. ("Congress could not have intended for Commerce's discretion to include the ability to select unreasonably high rates with no relationship to the respondent's actual dumping margin."). Within these constraints, Commerce is entitled to use the highest margin applied to DunAn or any other respondent. See Heveafil, 58 F. App'x

at 846, 849-50; De Cecco, 216 F.3d at 1032.

DunAn first argues that Commerce may not apply the China-wide rate because DunAn is independent from the Chinese government. See Qingdao Taifa Group Co. v. United States, __ CIT __, __, 637 F. Supp. 2d 1231, 1240-41 (2009), aff'd on other grounds, 581 F.3d 1375 (Fed. Cir. 2009); Gerber Food (Yunnan) Co. v. United States, 29 CIT 753, 771-72, 387 F. Supp. 2d 1270, 1287 (2005).  But the government responds that Commerce utilized the petition rate, rather than purposefully applying the China-wide rate, and claims that Commerce did not specifically group DunAn within the China-wide entity which received the China-wide rate: "Commerce's use of the petition rate as [AFA] for DunAn's December 2007 sales quantity [] cannot be equated to Commerce treating DunAn as part of the China-wide entity." (Def.'s Br. 22.)

Consistent with the government's arguments, in Commerce's determinations it referred to the high margin given to DunAn merely as the rate in the petition, and did not, in using this rate, deny DunAn a separate rate. Final Determination at 10,889; Decision Mem. at 52; Frontseating Service Valves from the People's Republic of China, 73 Fed. Reg. at 62,956; Application of AFA Mem. at 9. Compare Qingdao, __ CIT at __, 637 F. Supp. 2d at 1240, 1242 (reversing Commerce's decision, when applying AFA, to apply the PRC-wide rate instead of a separate rate).  As a consequence, whether or not Commerce can apply the China-wide rate to DunAn is irrelevant here.

Be that as it may, Commerce's use of the petition margin, when based upon secondary information such as the petition rate, still must approximate DunAn's actual rate, and Commerce must corroborate the use of the rate with evidence on the record. See PAM, 582 F.3d at 1340; De Cecco, 216 F.3d at 1032.

In this regard, DunAn does not argue that Commerce failed to adequately corroborate, as required by 19 U.S.C. § 1677e(c), Commerce's use of the 55.62 percent petition rate. Rather, DunAn argues that the applied rate was not directly related to the unverified information at issue. DunAn complains that, while Commerce found DunAn's sales quantity data to be unverifiable, Commerce, in its calculations, nonetheless used this same quantity data when calculating DunAn's weighted-average dumping margin. To DunAn, this choice was inconsistent.

Yet DunAn's argument is unpersuasive because it "conflate[s] Commerce's determination to reject as unreliable [certain information DunAn] submitted with Commerce's determination to use as AFA 'other' record evidence . . . ." Wash. Int'l Ins. Co. v. United States, No. 08-00156, 2010 Ct. Intl. Trade LEXIS 13, at *16-17 (CIT Feb. 9, 2010) (citation omitted). Commerce may, as here, use the quantity information rejected as unverifiable because it is DunAn's own number. DunAn cannot now complain that Commerce used, when applying AFA, the information DunAn itself submitted during the investigation. See id.

The court thus sustains Commerce's use of 55.62 percent as DunAn's AFA rate.

**D. Offset for Recycled Brass Scrap**

The court also rejects DunAn's final ground for remand. In using brass bar to manufacture its FSVs, DunAn produces by-product brass scrap. DunAn sells some of this scrap, but much of the brass scrap is recycled and integrated into later production of other FSVs. Responding to DunAn's case brief in the administrative proceeding below, the Department allowed an offset, in part, for the reduced value of brass scrap, and applied this offset to DunAn's normal value. See Decision Mem. at 58-59.

DunAn claims that Commerce's scrap offset methodology is contrary to law. Specifically, DunAn argues that Commerce reduced its calculation of DunAn's COP by the reduced value of brass scrap rather than subtracting the brass bar created from scrap from the total brass bar used. This method of calculating the offset, according to DunAn, leads to significant undervaluation of DunAn's cost savings from the use of recycled brass scrap.[57]

Commerce did not address this argument in its Decision Memorandum. Accordingly, DunAn asks that the court direct Commerce

---

[57] DunAn has not argued or presented the court with evidence that Commerce acts arbitrarily or capriciously in implementing its offset methodology.

to explain its choice of offset calculation.[58]

    The court's analysis of this issue begins with the recognition
that it is Commerce's consistent practice to grant, from the COP, an
offset of the scrap's sales value.[59]  In addition, the court sees no
conflict between the offset methodology and the governing statutes
and regulations, and thus determines the Department's practice to be
reasonable and hence in accordance with law.

    DunAn cites Commerce decisions to demonstrate that "the
Department's practice is not to value by-products reused in
production." (Pl.'s Reply Br. 13 (quoting Coated Free Sheet Paper
from the People's Republic of China, 72 Fed. Reg. 60,632 (Dep't
Commerce Oct. 25, 2007) (final determination of sales at less than
fair value), and accompanying Issues and Decision Memorandum,
A-570-906, POI 04/01/06 – 09/30/06 (Oct. 17, 2007), at 36, available

---

[58] Both the government and Parker note that DunAn's position
unrealistically treats brass scrap and brass bar as perfectly
interchangeable and so fails to take into account costs
associated with scrap processing. (Def.'s Br. 36; Def.-
Intervenor's Br. 27.)

[59] See Arch Chems., Inc. v. United States, No. 08-00040, 2009
Ct. Intl. Trade LEXIS 78, at *5-6 (CIT July 13, 2009); Ass'n of
Am. Sch. Paper Suppliers v. United States, No. 06-00395, 2008 Ct.
Intl. Trade LEXIS 128, at *20 (CIT Nov. 17, 2008); Ames True
Temper v. United States, 31 CIT 1303, 1317 (2007); Steel Concrete
Reinforcing Bars from the People's Republic of China, 66 Fed.
Reg. 33,522, 33,524 (Dep't Commerce June 22, 2001) (notice of
final determination of sales at less than fair value), and
accompanying Issues and Decision Memorandum, A-570-860, POI
10/1/99 - 3/30/00 (June 22, 2001), at Comment 5c, available at
http://ia.ita.doc.gov/frn/summary/prc/01-15652-1.txt (last
visited Apr. 19, 2010). (See also Pl.'s Br. 32.)

at http://ia.ita.doc.gov/frn/summary/PRC/E7-21041-1.pdf (last visited Apr. 19, 2010)) (quotation marks omitted).) Pursuant to this practice, Commerce will not add the value of the brass scrap as an FOP in calculating the COP, as the scrap came from the already-valued brass FOP.

But this is a different issue. Here, Commerce indeed did not add the sales value of the scrap to DunAn's COP. In fact, Commerce granted DunAn an offset because DunAn used some of the scrap. If DunAn's argument were correct, namely that the values of brass bar and brass bar scrap were equivalent and therefore were completely fungible, then the sales value of the scrap would equal the sales value of the brass bar and the value Commerce applied to the scrap would not be in dispute. Rather, for whatever reason, brass scrap does not equal brass bar, and it was thus reasonable for Commerce to treat these inputs differently based upon the sales value of each.

Moreover, the court does not agree that Commerce's failure to address this one issue constitutes error. Commerce is presumed to have considered all the record evidence, see Thomas v. Office of Pers. Mgmt., No. 2009-3107, 2010 WL 391327, at *2 (Fed. Cir. Feb. 4, 2010) (per curiam); Gonzales v. West, 218 F.3d 1378, 1381 (Fed. Cir. 2000); Nucor Corp. v. United States, 28 CIT 188, 233, 318 F. Supp. 2d 1207, 1247 (2004), aff'd, 414 F.3d 1331 (Fed. Cir. 2005), and need not address every argument raised by a respondent in its briefing. Timken U.S. Corp. v. United States, 421 F.3d 1350, 1354-56

(Fed. Cir. 2005). As has been explained many times before, the court will remand if Commerce "failed to consider an important aspect of the problem . . . ." <u>Motor Vehicle Mfr. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.</u>, 463 U.S. 29, 43 (1983). By following its reasonable established practice, Commerce has not so failed.

## Conclusion

For all of the foregoing reasons, Plaintiff's Motion for Judgment Upon the Agency Record is DENIED. Judgment will be entered for Defendant.

It is SO ORDERED.

 /s/ Donald C. Pogue
Donald C. Pogue, Judge

Dated: April 19, 2010
      New York, New York