# United States Court of Appeals for the Federal Circuit

---

**ZHEJIANG DUNAN HETIAN METAL CO., LTD.,**
*Plaintiff-Appellant,*

v.

**UNITED STATES,**
*Defendant-Appellee,*

**and**

**PARKER-HANNIFAN CORPORATION,**
*Defendant-Appellee,*

---

2010-1367

---

Appeal from the United States Court of International Trade in Case No. 09-CV-0217, Judge Donald C. Pogue

---

Decided: June 22, 2011

---

MARK E. PARDO, Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP, of Washington, DC, argued for plaintiff-appellant. With him on the brief was ANDREW T. SCHUTZ.

L.Misha Preheim, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellee United States. With him on the brief were TONY WEST,

Assistant Attorney General, JEANNE E. DAVIDSON, Director, and PATRICIA M. MCCARTHY Assistant Director. Of counsel on the brief was JOANNA THEISS, Attorney, Office of the Chief Counsel for Import Administration, United States Department of Commerce, of Washington, DC.

DONALD R. DINAN, Roetzel & Andress, LPA, of Washington, DC, argued for defendant-appellee Parker-Hannifin Corporation. With him on the brief was CRAIG A. KOENIGS.

———————————————

Before RADER, *Chief Judge*, MOORE and O'MALLEY, *Circuit Judges*.

O'MALLEY, *Circuit Judge*.

Zhejiang DunAn Hetian Metal Co. ("DunAn") appeals the decision of the United States Court of International Trade denying DunAn's Motion for Judgment Upon the Agency Record. This court has jurisdiction pursuant to 28 U.S.C. § 1295(a)(5). On appeal, DunAn raises three issues: whether (1) the United States Department of Commerce ("Commerce") erred in calculating the surrogate value for brass bar by including shipments from Japan, France, and the United Arab Emirates ("UAE"); (2) Commerce applied an improper adverse inference to DunAn's December 2007 sales quantity data; and (3) Commerce's valuation of labor pursuant to 19 C.F.R. § 351.408(c)(3) is contrary to 19 U.S.C. § 1677b(c)(4). DunAn's notice of appeal was timely. For the reasons explained below, we vacate and remand.

BACKGROUND

On March 19, 2008, Parker-Hannifin Corp. ("Parker-Hannifin" or "Appellee") filed an antidumping petition (the "Petition") on behalf of the domestic industry con-

cerning imports of frontseating service valves ("FSVs")[1] from the People's Republic of China ("China"), alleging that Chinese firms were exporting FSVs to the United States at prices that were less than fair value.[2] In April of 2008, Commerce initiated its antidumping duty investigation. *Frontseating Service Valves from the People's Republic of China: Preliminary Determination of Sales at Less Than Fair Value, Preliminary Negative Determination of Critical Circumstances, and Postponement of Final Determination*, 73 Fed. Reg. 62,952 (Dep't of Commerce Oct. 22, 2008) ("*Preliminary Determination*"). Commerce established July 1, 2007 through December 31, 2007 as the period of investigation. *Id.* On June 30, 2008, Commerce selected DunAn as a mandatory respondent for the investigation. *Id.* at 62,954. Commerce published its preliminary determination in October 2008. *Id.* In March of 2009, Commerce published its final determination.

---

[1] FSVs are designed to be used in residential air conditioning and heating systems such as split air conditioning equipment and heat pumps. . . . FSVs are used to isolate sections of an air conditioning system during diagnostic servicing, installation, repair, and to permit technicians to provide refrigerant charging and evacuating capabilities." *Frontseating Service Valves from China*, Inv. No. 731-TA-1148 (Final), USITC Pub. No. 4073 (April 2009).

[2] Pursuant to the antidumping statutes, Commerce may "determine[] that a class or kind of foreign merchandise is being, or is likely to be, sold in the United States at less than fair value." 19 U.S.C. § 1673 (2006). If Commerce finds that this activity is occurring, and if the corresponding domestic industry is materially injured or is materially hampered from forming by this so called dumping, Commerce is required to impose a duty on imports of this foreign merchandise. The duty is set at "an amount equal to the amount by which the normal value [of the merchandise in question] exceeds the export price." *Id.*

*Frontseating Service Valves from the People's Republic of China: Final Determination of Sales at Less Than Fair Value and Final Negative Determination of Critical Circumstances*, 74 Fed. Reg. 10,886 (Dep't of Commerce March 13, 2009) ("*Final Determination*"). The factual background relating to the specific issues presented on appeal is discussed below.

A. *Selection of a Surrogate Value for Brass Bar*

For the purposes of antidumping duty investigations, Commerce considers China to be a non-market economy. *Preliminary Determination*, 73 Fed. Reg. at 62,953. As a result, Commerce employed its non-market economy methodology to calculate the normal value of the FSVs DunAn exported. As described by Commerce,

> Section 773(c)(1)[3] of the Act directs [Commerce] to base normal value[4] ("NV") on the [non-market economy] producer's factors of production ("FOPs"), valued in a surrogate market economy ("ME") country or countries considered to be appropriate by [Commerce]. In accordance with section 773(c)(4)[5] of the Act, in valuing the FOPs, [Commerce] shall use, to the extent possible, the

---

[3] This section of The Tariff Act of 1930 was codified in 19 U.S.C. § 1677b(c)(1).

[4] In non-market economy cases, normal value is determined "on the basis of the value of the factors of production utilized in producing the merchandise to which shall be added an amount for general expenses and profit plus the cost of containers, coverings, and other expenses." 19 U.S.C. § 1677b(c)(1) (2006). Factors of production "include, but are not limited to . . . hours of labor required, . . . quantities of raw materials employed, . . . amounts of energy and other utilities consumed, and . . . representative capital cost, including depreciation." 19 U.S.C. § 1677b(c)(3) (2006).

[5] Codified in 19 U.S.C. § 1677b(c)(4).

prices or costs of the FOPs in one or more ME countries that are: (1) at a level of economic development comparable to that of the [non-market economy] country; and (2) significant producers of comparable merchandise.

*Id.* at 62,954 (internal footnotes added). In accordance with this methodology, Commerce selected India as the surrogate market economy. *Id.* ("[Commerce] found that India is at a level of economic development comparable to that of [China], is a significant producer of comparable merchandise (i.e., FSVs) and has publicly available and reliable data.").

With respect to the factors of production DunAn utilized to manufacture FSVs, DunAn indicated that brass bar was one of its primary raw materials. To value this factor of production, DunAn provided a first surrogate value submission that included Indian import statistics under Harmonized Tariff Schedule ("HTS") heading 7407.21.10 covering "brass bars" from the Monthly Statistics of the Foreign Trade of India, as published by the Government of India's Directorate General of Commercial Intelligence and Statistics of the Ministry of Commerce and Industry, as set forth in the World Trade Atlas ("WTA Indian import data"). In addition to this information, DunAn also submitted InfoDrive India data[6] pertaining to this HTS heading.

---

[6]   As described by the Court of International Trade: Infodrive India Pvt Ltd., an Indian company, publishes export and import information from India and other countries. Each month, Infodrive India "collects, collates and standardizes," from Indian ports, over two million export shipping bills and import bills of entry. Infodrive India then cleans up and stores the data on its server. Due to inconsistencies in

To value brass bar for the *Preliminary Determination*, Commerce used an average Indian import value, which represented the average value of all the materials imported into India under HTS category 7407.21.10 as reported in the WTA Indian import data. Joint Appendix ("JA") 247 ("[W]e find that WTA Indian import data represent the best available information for purposes of valuing brass bar and have relied upon these data in calculating margins for this preliminary determination."). In its preliminary determination, Commerce concluded that DunAn's weighted-average dumping margin was 26.72%. *Preliminary Determination*, 73 Fed. Reg. at 62,961.

In response to Commerce's preliminary determination, DunAn submitted a brief objecting to various aspects of the determination. Specifically, DunAn argued that, on the basis of the InfoDrive data, Commerce should exclude import data from Japan, France, and the UAE because the materials imported from these countries were not brass bar. According to DunAn, Commerce's inclusion of these materials in its calculation of the brass bar surro-

---

product information and the fact that, according to Infodrive India, "classification is often wrong," Infodrive India provides, for each import or export, the actual product description as well as the reported HTS Code. "Infodrive India presents Indian government import data that it receives on a monthly basis from the Indian customs department." "Infodrive India data appears to be the same data provided [in the WTA] in a desegregated form, providing descriptions of the items that are imported and classified under a particular [HTS] subheading."

*Zhejiang DunAn Hetian Metal Co. v. United States*, 707 F. Supp. 2d 1355, 1361 n.12 (Ct. Int'l Trade 2010) (internal citations omitted).

gate value rendered it less accurate, and, thus, resulted in an unduly high weighted-average dumping margin.

Despite DunAn's arguments, Commerce issued a final determination that calculated the surrogate value for brass bar without excluding the imports from Japan, France, and the UAE. *Antidumping Duty Investigation of Frontseating Service Valves from the People's Republic of China: Issues and Decision Memorandum for the Final Determination*, 2009 WL 736059 (Mar. 6, 2009), at comment 4 ("[Commerce] has concluded that for the final determination, we will continue to include the value of imports from Japan, France, and the UAE in calculating the surrogate value for brass bar . . . .") ("*Issues and Decisions Memorandum*"). Explaining its reasoning, Commerce stated:

> [W]ith respect to the imports in question . . . we find that the Infodrive data contain insufficient product information in the description of the line items to enable [Commerce] to make a definitive determination that these line items are misclassified. Specifically, the product description in the Infodrive data are such that, given the dependency upon the chemical make-up of the underlying products, they could be properly classified within the Indian HTS category where they are, or in the category addressed by DunAn. Thus, [Commerce] cannot determine, due to lack of product detail, i.e., chemical properties, the precise chemical make-up of these line items. Accordingly, without clear evidence to the contrary, [Commerce] will not speculate that these materials have been misclassified. Therefore, pursuant to section 773(c)(1) of the Act, [Commerce] has determined to include imports from Japan, France, and the UAE in calculating the surrogate value for brass bar in the

final determination because the record evidence does not demonstrate that the imports from these countries were misclassified.

*Id.* Commerce found, moreover, "that the WTA [Indian import data] represent[ed] the best surrogate value in this case because they are publicly available, product-specific, contemporaneous, tax exclusive, and representative of brass bar prices." JA 403.

B. *Application of Partial Adverse Facts Available to DunAn's December 2007 Sales*

During the period of investigation, DunAn reported that it had a single U.S. customer. According to DunAn, it maintained inventory in this customer's warehouse through a vendor managed inventory program. *Zhejiang DunAn Hetian Metal Co. v. United States*, 707 F. Supp. 2d 1355, 1372 (Ct. Int'l Trade 2010). Pursuant to this program, DunAn would ship FSVs from China to the customer's warehouse. The customer only actually purchased the FSVs when it withdrew them from the warehouse. *Id.* At the end of each month, the customer would send DunAn a consumption report that indicated how many of each type of FSV it had withdrawn. *Id.* Utilizing this information, DunAn would confirm both the quantities and prices indicated in the report. *Id.* Confirming prices was simple; the sales price for each FSV was established in a prior agreement between DunAn and its customer. *Issues and Decisions Memorandum*, 2009 WL 736059 at comment 12b. That price, moreover, did not vary on the basis of quantity sold, nor did it vary over the course of the period of investigation. Confirmation of the quantity of FSVs the customer removed from the warehouse was a more complicated exercise. A DunAn employee at the customer's warehouse would examine the product inventory to determine what had been removed.

*Zhejiang*, 707 F. Supp. 2d at 1372. If the customer's consumption report was correct, DunAn would send an invoice applying the predetermined prices to the figures in the report. *Id.* If the consumption report was inaccurate with respect to quantity, DunAn would correct the inaccuracies and send the customer a corrected invoice. *Id.* In addition, DunAn would keep a record of the discrepancy. *Id.* DunAn provided Commerce with sales invoices for the period of investigation.

The *Preliminary Determination* was made on the basis of this unverified sales information. *See Preliminary Determination*, 73 Fed. Reg. at 62,960. Commerce is, however, required to "verify all information relied upon" in making its final determination. 19 U.S.C. § 1677m(i)(1) (2006). During verification, Commerce determined that, for December 2007, DunAn's customer paid a total of thirty cents less for that period than the invoice indicated it owed. *Zhejiang*, 707 F. Supp. 2d at 1372. When questioned, DunAn provided no reason for the discrepancy. *Id.* Commerce also discovered that the consumption report and the sales invoice for December 2007 did not match; the quantities of FSVs used by DunAn's customer according to the consumption report differed significantly from the quantity of FSVs DunAn's customer was billed for using. *Id.*

Initially, DunAn did not have an explanation for these discrepancies. *Id.* at 1373. Later, however, DunAn explained that inaccurate quantities were reported in the December 2007 consumption report and that DunAn's employee at its customer's warehouse corrected the inaccuracies in the December 2007 invoice, thereby creating the discrepancy. *Id.* Despite DunAn's stated policy of keeping records of such inaccuracies, however, it had no record of any inaccuracy in the consumption report or of the correction in the invoice. *Id.* Eventually, DunAn

indicated that its customer probably misreported the quantity numbers for financial reasons. *Id.*

DunAn also maintained separate monthly inventory reports, which carried over the inventory from the previous month.[7]   *Id.*   Unlike the other monthly inventory reports, the January 2008 report did not account for the final inventory from the previous month.[8]  *Id.* at 1374.  In

---

[7]    Commerce explained that each monthly inventory report:

> [O]ther than January 2008, was similarly structured: the first column is total inventory from the previous month, the second column is inventory received during the current month, the third column is the total of the previous two columns, the fourth column is the usage during the current month, and the fifth column is the total ending inventory (the third column total minus the fourth column usage). This last column is then carried over to the next month's [monthly inventory report] as the first column.

*Zhejiang*, 707 F. Supp. 2d at 1374 n.44.

[8]    Describing the January 2008 report, Commerce stated:

> [T]he first column . . . is not the same as the last column of the December report, i.e., the ending inventory from December 2007. Rather, the first column of the January 2008 [monthly inventory report] is the same as the third column of the December 2007 [monthly inventory report], i.e., the total inventory in December before usage is deducted.  Therefore, the last two columns of the December 2007 [monthly inventory report] including December usage, which consists of the quantities reported by DunAn in its sales reconciliation, is excluded from the inventory calculation starting in January 2008.  Secondly, the January [monthly inventory report] has an additional column that the other reports do

other words, the report did not account for the December 2007 inventory remaining after subtracting the U.S. customer's purchases for that month; the January 2008 report instead used the U.S. customer's quantity reported in the consumption report. *Id.* After initially providing no explanation for the discrepancies in the monthly inventory reports, DunAn eventually indicated that it varied the structure of the January 2008 monthly inventory report for tax reasons. *Id.* at 1375.

In light of these inaccuracies and discrepancies, Commerce concluded that it was unable to verify DunAn's sales data for December 2007. *Issues and Decisions Memorandum*, 2009 WL 736059 at comment 12c ("We find that the information to construct an accurate and otherwise reliable margin with respect to certain of DunAn's U.S. sales in the month of December, and the information to value inventory carrying cost ('ICC') for all sales for the months of October, November and December 2007, is not available on the record."). Commerce also concluded that, in light of DunAn's failure to provide Commerce with accurate and verifiable data, and its lack of clarity during verification, the application of certain partial adverse

---

> not have: a column for the usage of the previous month: December 2007. We noted that the December 2007 usage column in January 2008 [monthly inventory report] contained the quantity figures from the [U.S. customer] monthly consumer report, not the quantities from the December 2007 sales invoice. Thus, the January 2008 [monthly inventory report] begins with the total inventory of December 2007 (without the deduction of December 2007 usage), and then deducts December 2007 usage based on the [U.S. customer] monthly consumption report figures, and January 2008 usage."

*Id.*

facts available ("partial AFA") inferences was proper with respect to certain sales of two types of FSVs. *Id.* ("We determine that . . . DunAn failed to cooperate by not acting to the best of its ability to comply with [Commerce's] request for information by not providing it with accurate and verifiable U.S. sales data, and that the application of partial AFA is therefore warranted."). With respect to these sales, Commerce first applied an adverse inference to the ICC information it found incalculable on the basis of DunAn's record. Commerce then applied 55.62% as the transaction specific dumping margin for DunAn's December 2007 sales of the two FSVs. *Final Determination*, 74 Fed. Reg. at 10889 ("Accordingly, as partial AFA for certain U.S. sales, [Commerce] is applying the rate from the initiation, which is 55.62 percent.").

C. *Regression Analysis to Value Labor*

In accordance with 19 C.F.R. § 351.408(c)(3),[9] Commerce valued the labor factor of production using regression analysis that included wage rates and gross national income data from sixty-one market economy countries. *Zhejiang*, 707 F. Supp. 2d at 1366. On this basis, Commerce determined that DunAn's surrogate wage was $1.04 per hour. *Id.* at 1368. DunAn argued that this analysis was impermissible because it utilized data from countries that were neither economically comparable to China nor significant producers of comparable merchandise. *Issues and Decisions Memorandum*, 2009 WL 736059 at comment 3; *see also* 19 U.S.C. § 1677b(c)(4)

---

[9] For labor, [Commerce] will use regression-based wage rates reflective of the observed relationship between wages and national income in market economy countries. [Commerce] will calculate the wage rate to be applied in nonmarket economy proceedings each year. The calculation will be based on current data, and will be made available to the public." § 351.408(c)(3) (2010).

(2006) ("[Commerce] in valuing factors of production . . . shall utilize, to the extent possible, the prices or costs of factors of production in one or more market economy countries that are — (A) at a level of economic development comparable to that of the nonmarket economy country, and (B) significant producers of comparable merchandise."). Commerce rejected these arguments, and utilized this surrogate, regression-based wage rate in its final determination. *Issues and Decisions Memorandum*, 2009 WL 736059 at comment 3 ("Because the Department's regression analysis utilizes the best available information for the calculation of a surrogate value for labor, complies with [Commerce's] regulation, and comports with the statute, [Commerce] continues to value labor in this case using its regression analysis . . . .").

### D.  *The Court of International Trade's Decision*

DunAn appealed Commerce's final determination to the Court of International Trade. *Zhejiang*, 707 F. Supp. 2d at 1359. In this appeal, DunAn challenged a variety of Commerce's determinations, including the three issues raised before this court. Sustaining Commerce's final determination in all respects, the Court of International Trade denied DunAn's Motion. *Id.* at 1382.

### DISCUSSION

### A.  *Standard of Review*

We review "a decision of the Court of International Trade evaluating an antidumping determination by Commerce by reapplying the statutory standard of review that the Court of International Trade applied in reviewing the administrative record." *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1379 (Fed. Cir. 2003) (citing *Ta Chen Stainless Steel Pipe, Inc. v. United States*, 298 F.3d 1330, 1335 (Fed. Cir. 2002)). In recognition of Com-

merce's expertise in administering the antidumping laws, courts grant deference to its decisions. *See, e.g.*, *Id.* at 1379 ("Commerce's special expertise in administering the anti-dumping law entitles its decisions to deference from the courts."); *Torrington Co. v. United States*, 68 F.3d 1347, 1350–51 (Fed. Cir. 1995). We will "uphold Commerce's determination unless it is 'unsupported by substantial evidence on the record, or otherwise not in accordance with law.' " *Micron Tech., Inc. v. United States*, 117 F.3d 1386, 1393 (Fed. Cir. 1997) (quoting 19 U.S.C. § 1516a(b)(1)(B)(i) (2006)).

Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Nippon*, 337 F.3d at 1379 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). This court reviews the record as a whole, including evidence that supports as well as evidence that "fairly detracts from the substantiality of the evidence." *Id.* at 1379 (quoting *Atl. Sugar, Ltd. v. United States*, 774 F.2d 1556, 1562 (Fed. Cir. 1984)). In sum, the question before this court on review is whether "the administrative record contains substantial evidence to support the determination and was it a rational decision." *Gerald Metals, Inc. v. United States*, 132 F.3d 716, 720 (Fed. Cir. 1997) (citation omitted).

B.  *Commerce's Calculation of the Brass Bar Surrogate Value*

DunAn's first argument on appeal is that Commerce erred when it calculated the surrogate value for brass bar using the WTA Indian import data that included imports from Japan, France, and the UAE. DunAn argues that Commerce should have excluded the imports from Japan, France, and the UAE from the WTA Indian import data before it calculated the surrogate value for brass bar. In

support, DunAn provided Commerce with InfoDrive data that it argued established that the imports from these countries were not brass bar and had been imported under the incorrect HTS heading.

Commerce refused to exclude the imports from these countries because:

> the product description in the Infodrive data are such that, given the dependency upon the chemical make-up of the underlying products, they could be properly classified within the Indian HTS category where they are, or in the category addressed by DunAn. Thus, the Department cannot determine, due to lack of product detail, i.e., chemical properties, the precise chemical make-up of these line items. Accordingly, without clear evidence to the contrary, the Department will not speculate that these materials have been misclassified.

*Issues and Decisions Memorandum*, 2009 WL 736059 at comment 4. The Court of International Trade found that substantial evidence supported Commerce's decision not to exclude the imports from these countries because there was insufficient evidence in the record upon which Commerce could have concluded that the imports from these countries were imported under the incorrect HTS heading, and thus, were not representative of the material DunAn used to manufacture FSVs. *Zhejiang*, 707 F. Supp. 2d at 1363–65.

Commerce's selection of a value for brass bar is governed by 19 U.S.C. § 1677b(c). This statute requires Commerce to choose data that is the "best available information" on the record. § 1677b(c)(1). Commerce is granted broad discretion to determine whether information is the best available because the statute does not

define the term.  *Taian Ziyang Food Co. v. United States*, 637 F. Supp. 2d 1093, 1125  (Ct. Int'l Trade 2009) (citing *Rhodia, Inc. v. United States*, 185 F. Supp. 2d 1343, 1351 (Ct. Int'l Trade 2001)).  In determining the valuation of the factors of production, "the critical question is whether the methodology used by Commerce is based on the best available information and establishes the antidumping margins as accurately as possible."  *Shakeproof Assembly Components v. United States*, 268 F.3d 1376, 1382 (Fed. Cir. 2001).  This court's duty is "not to evaluate whether the information Commerce used was the best available, but rather whether a reasonable mind could conclude that Commerce chose the best available information."  *Goldlink Indus. Co. v. United States*, 431 F. Supp. 2d 1323, 1327 (Ct. Int'l Trade 2006).

The thrust of DunAn's argument is that the record established that the imports from Japan, France, and the UAE were not brass bar.  Accordingly, because these imports were not representative of the input DunAn actually used "it [was] unreasonable for Commerce to use these shipments in its surrogate value calculation even if they were properly classified [in the HTS heading]."  DunAn Br. 38.  The problem with DunAn's argument is that the record does not establish that the materials imported from Japan, France, and the UAE were products *other* than brass bar.

DunAn is correct that the InfoDrive data included "actual product descriptions" of the materials imported from Japan, France, and the UAE.  It is also correct that, according to the product descriptions, the materials imported from these countries were copper bar, bronze bar, beryllium copper flat bar, beryllium copper round bar and cupro nickel bar.  DunAn, moreover, provided evidence that such materials were not representative of the material it used to manufacture FSVs, and that these

materials would be imported under different HTS headings, not 7407.21.10. DunAn is, however, incorrect that all of this information "plainly established that 100% of the shipments from these three countries were for products other than the brass bar used by DunAn to produce the subject valves." DunAn Br. 29.

Here, Commerce was faced with two sets of data and those data points were inconsistent. The first is the HTS heading under which the materials in question were imported into India. The other set of data is the product descriptions contained in the InfoDrive data. As DunAn concedes, for the imports in question, it is impossible for both the HTS heading and the product descriptions to be accurate. If the product descriptions are accurate, the materials should have been imported under a different HTS heading. If, on the other hand, the HTS heading is correct, the product descriptions must be incorrect. The evidence DunAn provided does not establish which data set is correct.

Instead, DunAn simply assumes that InfoDrive's product descriptions are correct and the HTS headings incorrect. For example, DunAn maintains that "[t]he InfoDrive India data on this record showed that many of the shipments within HTS 7407.21.10 were not actually brass bar." DunAn Br. 35. In support, DunAn only points to the Court of International Trade's discussion of how InfoDrive creates its data. *Id.* at 34–35 (discussing quotation cited *supra* n.6). This discussion by the Court of International Trade does not establish that the descriptions contained in the InfoDrive data are accurate, however. Specifically, according to InfoDrive, it receives its data directly from the Indian Customs officials and then "presents the Indian customs data exactly as it is received, without additions or deletions." *Dorbest Ltd. v. United States*, 462 F. Supp. 2d 1262, 1282 (Ct. Int'l Trade

2006) ("Infodrive India data appears to be the same data provided [in the WTA] in a desegregated form, providing descriptions of the items that are imported and classified under a particular [HTS] subheading.").

As the Court of International Trade in this case said, "[e]ach month, Infodrive India collects, collates and standardizes from Indian ports, over two million export shipping bills and import bills of entry." *Zhejiang*, 707 F. Supp. 2d at 1361 n.12 (internal citations and quotations omitted). Given this volume, there is no reason to believe and no evidence in the record to indicate that InfoDrive does anything to verify the information it receives. While InfoDrive states that it includes both product descriptions and HTS headings because the "classification is often wrong," *id.*, this does not establish *ipso facto* that it is the product descriptions which are correct. As DunAn admits, InfoDrive provides "an actual product description for the shipment taken from the shipping bill." DunAn Reply Br. 1. What DunAn overlooks is that the same importer who classified the goods into an HTS heading also provided the apparently conflicting description of the goods. Oral Argument at 6:45, *Zhejiang DunAn Hetian Metal Co. v. United States*, No. 2010-1367 (Fed. Cir. Mar. 3, 2011), *available                                                                at* http://oralarguments.cafc.uscourts.gov/Audiomp3/2010-1367.mp3.[10] DunAn offers no concrete reason to assume

---

[10]    At oral argument, the following exchange occurred:

> Court: "Who classified them?"
>
> Counsel for DunAn: "Whoever the importer was in India or their customs broker."
>
> Court: "So the importer classifies them and he also provides information so he says here is

that, where a conflict in the two is apparent, the product description provided is always correct, while the HTS heading the same source provided is always incorrect. The InfoDrive product descriptions and the HTS headings it reports are all from the same source. Accordingly, where the HTS heading and the product descriptions are mutually exclusive, it is not possible, on the basis of only the InfoDrive descriptions and the HTS headings, to determine which is correct, and Commerce has no obligation to assume that the HTS heading — the data point upon which it normally relies — should not control.

The cases and determinations in prior dumping investigations cited by DunAn do not alter this conclusion. Those cases all share the common fact that the HTS heading chosen by Commerce was overly inclusive. In other words, the HTS heading, by definition, included materials that were not representative of the inputs utilized by the manufacturer. For this reason, both the HTS heading and the product descriptions could describe accurately the materials imported. In that situation, calculating a surrogate value on the basis of every material imported under the HTS heading, in the face of InfoDrive descriptions suggesting that certain imports were not representative, might well conflict with Commerce's obligation to use the best available evidence for its calculation of surrogate value.

In *Longkou Haimeng Machinery Co. v. United States*, for example, Commerce selected an HTS heading which contained several different types of pig iron, all of which

---

my HTS classification and I am importing copper bar."

Counsel for DunAn: "Correct . . . ."

Oral Argument at 6:45, *DunAn v. United States*, No. 2010-1367.

had less than or equal to 0.5% phosphorous. 581 F. Supp. 2d 1344, 1361–62 (Ct. Int'l Trade 2008). The manufacturer cited InfoDrive data indicating that as much as 70% of the material imported into India under the relevant HTS heading was Sorelmetal. *Id.* at 1363. Sorelmetal was not suitable for manufacture of the subject merchandise because it has very different properties than the specific pig iron the manufacturer utilized. *Id.* In response to this argument, Commerce stated that it had chosen this heading because it was contemporaneous with the period of review and it was specific to the raw material used by the manufacturer because the manufacturer indicated that it used pig iron with less than or equal to 0.5% phosphorous. *Id.* at 1362. The Court of International Trade found Commerce's argument insufficient to explain why the HTS heading was the best available information for valuing the pig iron utilized by the manufacturer. *Id.* at 1363. The court concluded that Commerce's argument:

> [d]id not address the question of whether or not the pig iron imports into India, under HTS 7201.1000, are consistent with the pig iron consumed by Plaintiffs. Therefore, the Court finds that Commerce failed to adequately explain whether the Indian imports under HTS 7201.1000 are the best available information for valuing pig iron consumed by the Plaintiffs in the production of subject merchandise.

*Id.*

DunAn does not dispute that the HTS heading selected by Commerce is the heading under which the type of brass bar it uses should be categorized during importation into India. Nor does it argue that the category is extremely broad such that it properly also includes mate-

rials other than those DunAn utilizes. *See Zhejiang*, 707 F. Supp. 2d at 1365. Instead, DunAn argues that the imports from Japan, France, and the UAE were improperly categorized during importation and should have been imported under *other* HTS headings. Commerce and the court below concluded that the imports from Japan, France, and the UAE should be included in Commerce's calculation because the InfoDrive data was not, standing alone, sufficient evidence to support DunAn's contention that the imports from these countries received incorrect HTS headings during importation. Thus, unlike the circumstances in *Longkou Haimeng Machinery Co.*, here the HTS heading is not so broad that it could encompass the InfoDrive descriptions. Given this fact, Commerce was unwilling to find that the materials were improperly categorized based on the InfoDrive description, absent some other evidence to indicate that the InfoDrive descriptions were correct, and the HTS heading incorrect. *Issues and Decisions Memorandum*, 2009 WL 736059 at comment 4.

DunAn notes that Commerce was admonished previously by the Court of International Trade for not affording InfoDrive data sufficient weight.[11] These cases do not, as the Court of International Trade determined in this case, stand for the broad proposition that InfoDrive data must control Commerce's decision making. *Zhejiang*, 707 F. Supp. 2d at 1364–65. These cases focus on a complete failure to address "whether or not Infodrive India casts light on potential inaccuracies" in the WTA data. *Dorbest*, 462 F. Supp. 2d at 1284. Here, however, Commerce did address the relevance of the InfoDrive descriptions. As the Court of International Trade concluded, "Commerce,

---

[11] *E.g., Taian Ziyang Food Co.*, 637 F. Supp. 2d at 1149; *Longkou Haimeng Machinery Co.*, 581 F. Supp. 2d at 1363; *Dorbest*, 462 F. Supp. 2d at 1286, 1288.

assuming the Infodrive data were in fact reliable, directly discussed Infodrive India's relevance to the WTA data and found the Infodrive data to be inconclusive." *Zhejiang*, 707 F. Supp. 2d at 1365.

Contrary to DunAn's assertion, moreover, Commerce was not addressing the wrong issue when it stated that it would require additional information — such as chemical analysis of the imports in question — before it would conclude that the imports were classified incorrectly. *Id.* DunAn is correct that the question before Commerce was whether the imports in the classification chosen by Commerce were representative of the input DunAn utilized. Because DunAn did not argue that the 7407.21.10 HTS heading properly would have included inputs that were not representative of the input it utilized, however, the only question was whether the products from Japan, France, and the UAE were characterized properly under this HTS heading. On the record before it, Commerce would need to resort to speculation to conclude that they were not. We cannot say, therefore that no reasonable mind could conclude that Commerce calculated the surrogate value as accurately as possible.

Finally, DunAn cites *Lightweight Thermal Paper From the People's Republic of China: Final Determination of Sales at Less Than Fair Value*, 73 Fed. Reg. 57,329 (Oct. 2, 2008), and accompanying Issues & Decision Memorandum at comment 9, claiming it sets forth the test Commerce must employ to determine when it will consider InfoDrive data. As articulated in *Lightweight Thermal Paper*,

> [Commerce] also considers Infodrive data when further evaluating import data, provided the following conditions are met: 1) there is direct and substantial evidence from Infodrive reflecting the

imports from a particular country; 2) a significant portion of the overall imports under the relevant HTS category is represented by the Infodrive India data; and 3) distortions of the AUV [average unit value] in question can be demonstrated by the Infodrive data.

*Id.* Deciding to exclude certain imports from an HTS basket category on the basis of InfoDrive data, Commerce in *Lightweight Thermal Paper* stated,

Petitioner has placed on the record Infodrive import data representing approximately 88 percent of the imports of the base paper HTS category from the United States into India for the [period of investigation]. These data indicate that a significant majority (i.e., over 90 percent) of these imports are not first quality base paper, but rather are almost all "mill rejected" paper (i.e., defective merchandise) along with some "coated printing" paper. Because the total imports from the United States constitute 68 percent of all imports into India under this HTS category, and because they have an AUV that is 70 percent below that of the next largest exporter, we find that such imports of "mill rejected" paper are aberrational with respect to other base paper import values and have a demonstrably distortive effect on the overall AUV, lowering it by more than 60 percent.

*Id.*

This test does not support excluding the imports from Japan, France, and the UAE on the record in this case, however. DunAn has not provided any evidence with respect to what percentage of the total exports into India under the HTS heading in question are from Japan, France, and the UAE, nor has it provided evidence that

the overall AUV is dramatically distorted.[12]    Indeed, Commerce noted that the InfoDrive data only accounted for 26% of the WTA data.  Thus, even if *Lightweight Thermal Paper* sets forth a controlling test for our consideration, based on this record, DunAn cannot establish prongs two and three of that test.

Because Commerce's reading of the evidence was reasonable, the court rejects DunAn's challenge to Commerce's use of HTS 7407.21.10, including data on imports from Japan, France, and the UAE, to calculate the surrogate value of brass bar.  Accordingly, the Court of International Trade did not err by including the imports from Japan, France, and the UAE.

## C. *Application of Partial Adverse Facts Available*

The second issue before this court is whether Commerce properly selected the adverse inference it applied to certain sales of FSVs in December 2007.[13]  DunAn does not challenge Commerce's finding that use of facts otherwise available and an adverse inference were necessary.  It only disputes the extent to which Commerce resorted to the use of adverse inferences in its calculation.  More specifically, Commerce found the sales volume data for December 2007 lacking and found that there was insufficient data available to value the ICC for all sales in October, November and December — i.e., it made a de-

---

[12]    The Court of International Trade determined that removing the imports from Japan, France, and the UAE would decrease the overall AUV by 8.13%. *Zhejiang*, 707 F. Supp. 2d at 1362 n.18.

[13]    In addition, DunAn argues, in the alternative, that "the transaction specific margin of 55.64% [sic] from the petition that Commerce applied to these sales was unsupported by record evidence." DunAn Br. 44.  Given our conclusion that Commerce improperly selected the partial AFA it applied, we do not reach this issue.

termination that it needed to resort to facts otherwise available to fill these gaps in the record. As to the ICC, Commerce filled the gap with a partial adverse inference with which DunAn does not take issue on appeal. It is the way Commerce chose to address the gap in the December 2007 sales data to which DunAn objects. In response to the missing December 2007 sale data, Commerce applied a 55.62% transaction specific dumping margin to the sales of two types of FSVs in that month. The Court of International Trade concluded that use of that margin was supported by substantial evidence. *Zhejiang*, 707 F. Supp. 2d at 1379. It is that conclusion which DunAn appeals.

Resolution of this issue requires an examination of the statutes relating to the application of both facts otherwise available and adverse inferences. 19 U.S.C. § 1677e(a) governs the application of facts otherwise available. Commerce may use facts otherwise available in reaching its determination, specifically where:

(1) necessary information is not available on the record, or

(2) an interested party or any other person —

(A) withholds information that has been requested by the administering authority or the Commission under this title,

(B) fails to provide such information by the deadlines for submission of the information or in the form and manner requested, subject to . . . [other provisions not relevant here],

(C) significantly impedes a proceeding under this title, or

(D) provides such information but the information cannot be verified as provided in [19 U.S.C. § 1677m(i)] . . . .

19 U.S.C. § 1677e(a) (2006). Commerce's use of an adverse inference is governed by 19 U.S.C. § 1677e(b), which provides:

> If [Commerce] finds that an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information from the administering authority or the Commission, [Commerce], in reaching the applicable determination under this subtitle, may use an inference that is adverse to the interests of that party in selecting from among the facts otherwise available. Such adverse inference may include reliance on information derived from — (1) the petition, (2) a final determination in the investigation under this subtitle, (3) any previous review under § 1675 of this title or determination under § 1675b of this title, or (4) any other information placed on the record.

19 U.S.C. § 1677e(b) (2006).

As these two subsections make clear, Commerce first must determine that it is proper to use facts otherwise available before it may apply an adverse inference *E.g.*, *Shandong Huarong Machinery v. United States*, 435 F. Supp. 2d 1261, 1289 (Ct. Int'l Trade 2006) ("Absent a valid decision to use facts otherwise available, Commerce may not use an adverse inference."). The use of facts otherwise available, moreover, is only appropriate to fill gaps when Commerce must rely on other sources of information to complete the factual record. *Nippon*, 337 F.3d at 1381 (noting that "[t]he mere failure of a respondent to furnish requested information — for any reason — requires Commerce to resort to other sources of information to complete the factual record on which it makes its

determination"). After Commerce has determined that the use of facts otherwise available is proper, it can " 'use an inference that is adverse to the interests of [a respondent] in selecting from among the facts otherwise available,' only if Commerce makes the separate determination that the respondent 'has failed to cooperate by not acting to the best of its ability to comply.' " *Id.* (quoting § 1677e(b)).

Here, Commerce argues that it could not determine the transaction specific dumping margin for the December 2007 sales of the two FSVs in question and that DunAn failed to cooperate fully in Commerce's effort to do so. Accordingly, Commerce filled this gap by selecting 55.62% as the transaction specific dumping margin for the December 2007 sales of these FSVs. DunAn responds that Commerce could have calculated the transaction specific dumping margin for the December 2007 sales with verified data in the record and, thus, did not need to resort to any adverse inference on this issue.

Dumping margin is defined as "the amount by which the normal value exceeds the export price or constructed export price of the subject merchandise." 19 U.S.C. § 1677(35)(A) (2006).[14] The sale price of each FSV was determined in a prior agreement between DunAn and its customer and not when the actual sale of each FSV occurred.[15] *Issues and Decisions Memorandum*, 2009 WL

---

[14] The formula for this determination is: (normal value – net U.S. price)/net U.S. price = Dumping margin. This margin is different for each product sold, so it is referred to as the transaction specific dumping margin.

[15] Parker-Hannifin admitted this fact when it argued that DunAn listed the incorrect date as the date of sale. *Issues and Decisions Memorandum*, 2009 WL 736059 at comment 12b. It argued "that the record evidence shows that DunAn's agreement with its customer

736059 at comment 12b. Significantly, the price of each type of FSV was fixed during the entire period of investigation and did not vary depending on quantity of product ordered. As DunAn stated, "[w]ith respect to all selling and movement expenses necessary to derive the net U.S. price of these sales, Commerce only took issue with the reported inventory carrying cost amounts (a separate AFA finding not being challenged herein)." DunAn Br. 51. Commerce verified the other factor of production data it needed to calculate the normal value for each valve model. Parker-Hannifin concedes the only missing information was the December sales quantity of the two FSVs at issue. *See* Parker-Hannifin Br. 16 ("While it may be possible to apply facts otherwise available to a single factor in certain circumstances, it is not possible here because Commerce could not calculate the margin without the missing sales quantity information.").

Thus, the issue before this court is whether it is possible to calculate a transaction specific dumping margin without sales quantity. In this case, we find that it is. Parker-Hannifin is correct that, when units are sold and the only data related to the sale is the gross price, you must know the quantity of units sold to determine gross price per unit. Quantity sold is not required, however, when a unit is sold at a predetermined gross unit price; if the gross unit price is already known, it is, by definition, independently verifiable. As Parker-Hannifin concedes, gross unit price is all that is required for Commerce to determine the net unit price. With this information, Commerce can determine the transaction specific dumping margin for sales of the two FSVs in the month of December 2007. Of course, the quantity of the FSVs sold

---

established the price of goods that the customer could then withdraw from the inventory at will." *Id.*

in December 2007 is required to determine DunAn's *overall* dumping margin.  DunAn concedes this point.  DunAn Br. 52 ("[DunAn's] overall dumping margin is then derived by calculating a weighted average of each transaction-specific dumping margin on the basis of the quantities for each reported sale.").

Because Commerce could have calculated the transaction specific dumping margin for the December 2007 sales of the FSVs in question without the sales quantity of these FSVs, we must determine whether Commerce properly applied 55.62% as a partial AFA in such circumstances

The cases cited by Parker-Hannifin in support of its argument that Commerce was allowed to apply a partial AFA, as it did in this case, do not support that argument.  *E.g.*, *F.Lli De Cecco Di Filippo Fara S. Martino S.p.A v. United States*, 216 F.3d 1027 (Fed. Cir. 2000); *Nippon*, 337 F.3d at 1377–78.  *F.Lli De Cecco*, for example, does not address the issue presented in this case; it dealt with the discretion Commerce is afforded in selecting which adverse inference it wants to use to fill the gap in the record created by a party's failure to provide necessary information.  *F.Lli De Cecco*, 216 F.3d at 1032–33.  *F.Lli De Cecco* simply does not address what constitutes a "gap" in the record.  Similarly, *Nippon* does not support Parker-Hannifin's position.  While *Nippon* dealt with the application of an adverse inference in selecting a transaction specific dumping margin, the court made clear that, without the information withheld by the manufacturer, Commerce could not determine the transaction specific dumping margin.  *Nippon*, 337 F.3d at 1377–78.  Again, *Nippon* dealt with the propriety of the adverse inference, not with determining what constituted a gap in the record before Commerce.

Finally, Parker-Hannifin cites *Steel Authority of India, Ltd. v. United States*, 149 F. Supp. 2d 921 (Ct. Int'l Trade 2001), in support of its argument. As DunAn argues, that case is not analogous to this one. In *Steel Authority*, the court addressed whether Commerce correctly used an adverse inference when applying "total facts available." *Id.* at 926–27. "Total facts available" is used by Commerce in situations where none of the reported data is reliable or usable. *Id.* at 928–29 (upholding use of total facts available where all of the manufacturer's submitted data exhibited pervasive and persistent deficiencies that cut across all aspects of the data). In *Steel Authority*, the manufacturer argued that Commerce had to utilize some of the evidence it provided, which Commerce verified. The court held that, in the context of total facts available, Commerce can ignore all data submitted where the bulk of it is determined to be flawed and unverifiable. *Id.* *Steel Authority* does not stand for the proposition that, when Commerce uses a partial AFA, it can ignore evidence that *is* both verified and directly pertinent to the determinations Commerce must make. *Steel Authority* did not hold that Commerce may use an AFA to do more than fill the actual gap in the record.

*Gerber Food (Yunnan) Co. v. United States*, 387 F. Supp. 2d 1270 (Ct. Int'l Trade 2005), directly addresses the issue before the court. In *Gerber*, the manufacturer's presented inconsistent information regarding the extent to which one of the manufacturers acted as an export agent for the other. *Id.* at 1281. The Court of International Trade found that, despite these inconsistencies, there remained adequate information in the record to calculate the assessment rates for both manufacturers. *Id.* at 1282. Commerce had declined to use this information to calculate the assessment rates and, instead, applied an AFA to select the assessment rate. *Id.* at 1281–

83.  After discussing the relevant statutes and case law, the court concluded that, "[b]ecause Commerce is empowered to use adverse inferences only in 'selecting from among the facts otherwise available,' it may not do so in disregard of information of record that is not missing or otherwise deficient." *Id.* at 1288.  While this reasoning is not binding on this court, it is persuasive.

For the reasons stated in *Gerber*, and under the plain language of § 1677e(a), it is clear that Commerce can only use facts otherwise available to fill a gap in the record. Here, the gap in the record is the quantity of two FSVs sold in December 2007.  Because Commerce could calculate the transaction specific dumping margin for these FSVs without that missing information, it was improper for Commerce to apply an AFA and choose 55.62% as the transaction specific dumping margin.  The Court of International Trade, thus, erred by concluding that Commerce properly applied the AFA.  The case is remanded to the Court of International Trade with instructions to use a partial AFA only in selecting the quantity of the December 2007 sales of the FSVs at issue for purposes of calculating the relevant total dumping margin.

D.  *Calculation of Surrogate Labor Rate*

The final issue on appeal is whether 19 C.F.R. § 351.408(c)(3), relating to the use of regression analysis to value labor, is contrary to 19 U.S.C. § 1677b(c)(4).  As both parties concede, *Dorbest Ltd. v. United States*, 604 F.3d 1363, 1372 (Fed. Cir. 2010), which was decided after the Court of International Trade issued its opinion in this case, is controlling.  *Dorbest* held that Commerce's use of regression analysis to determine the value of labor, in accordance with § 351.408(c)(3), is contrary to § 1677b(c)(4).  *Id.*  In light of *Dorbest*, this court agrees with the parties that the Court of International Trade's

opinion was incorrect. In situations involving non-market economies, "given that the governing statute requires the use of data from economically comparable market-economy countries that are significant producers of comparable merchandise unless such data are not available, 19 C.F.R. § 351.408(c)(3) does not comply with the statutory requirements." *Id.* Accordingly, this case is remanded to the Court of International Trade to value labor in accordance with *Dorbest*.

## CONCLUSION

For the reasons discussed above, the judgment of the Court of International Trade is vacated. This case is, accordingly, remanded to the Court of International Trade for further proceedings to determine: (1) the partial AFA with respect to quantity of the FSVs in question sold in December 2007 for purposes of calculating DunAn's total dumping margin based on the transaction specific dumping margin which is verifiable from the record; and (2) the labor value, using a method that complies with *Dorbest*.

**VACATED AND REMANDED**

## COSTS

No Costs.